2013-1588, -1589, 2014-1112, -1687

---

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

---

**CONTENT EXTRACTION AND TRANSMISSION LLC,**
*Plaintiff-Appellant,*
**v.**
**WELLS FARGO BANK, NATIONAL ASSOCIATION,**
*Defendant-Appellee,*
**AND**
**THE PNC FINANCIAL SERVICES GROUP, INC. AND PNC BANK, N.A.,**
*Defendants-Appellees.*
**---------------------------------------------------**
**DIEBOLD, INCORPORATED,**
*Plaintiff-Appellee,*
v.
**CONTENT EXTRACTION AND TRANSMISSION LLC,**
*Defendant-Appellant,*
**AND**
**MITCHELL MEDINA, CATHERINE ELIAS, JOHN DOE COMPANIES 1-100, JOHN DOE COMPANIES 1-99, TD BANK GROUP, TD BANK, N.A., AND JEANMARC ZIMMERMAN,**
*Defendants.*
(Caption continued on inside cover)

---

Appeals from the United States District Court for the District of New Jersey in Nos. 12-CV-2501, 12-CV-6960, and 3:12-CV-07640, Judge Michael A. Shipp.

---

# THIRD BRIEF FOR APPELLANT

---

ZIMMERMAN & WEISER LLP
Jean-Marc Zimmerman
Anatoly S. Weiser
226 St. Paul Street
Westfield, New Jersey 07090
Tel: (908) 654-8000
Fax: (908) 654-7207
jmz@iplcounsel.com
aw@ iplcounsel.com
*Attorneys for Content Extraction and Transmission LLC*

Becker Gallagher · Cincinnati, OH · Washington, D.C. · 800.890.5001

**AND**
**DIEBOLD, INCORPORATED,**
*Plaintiff-Cross-Appellant*
v.

**CONTENT EXTRACTION AND TRANSMISSION LLC**,
*Defendant-Appellant*

**MITCHELL MEDINA, CATHERINE ELIAS, JEAN-MARC ZIMMERMAN, JOHN DOE COMPANIES 1-100, TD BANK GROUP, TD BANK, N.A., JOHN DOE COMPANIES 1-99**,
*Defendants*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... iv

A. CET'S REPLY ARGUMENTS ON APPEAL .......... 1

1. CET Has Preserved All Patent-Eligibility Arguments .......... 1

2. The District Court's Errors In Holding Hundreds Of Claims Invalid Without Claim-By-Claim Analysis And Without Factual Inquiry Were Prejudicial .......... 4

3. The District Court Erred By Not Requiring PNC To Establish Invalidity On A Claim-By-Claim Basis .......... 4

a. Invalidity Must Be Established Claim-By-Claim .......... 6

b. PNC Never Rebutted Presumption Of Validity Claim-By-Claim .......... 9

c. CET Did Not Waive Claim-By-Claim Construction .......... 13

*i. Patentee Is Not Required To Identify Asserted Claims In Pleading* .......... 13

*ii. CET Asked The District Court To Allow Some Factual Development* .......... 14

*iii. Brief Page Limitations Do Not Eliminate Claim-by-Claim Analysis Requirement* .......... 14

4. The District Court Erred By Short-Circuiting All Factual Exploration Before Deciding Patent-Eligibility .......... 15

5. The Claims Are Patent-Eligible .......... 21

a. Claims Do Not Preempt A Fundamental Concept .......... 21

b. CET's Claims Are Not Directed To Mental Steps .......... 23

c. Copyright-Like Algorithm Recitation Is Not Required ........... 26

d. CET's Claims Satisfy Transformation Prong Of MOT Test ........ 27

e. Scanner/Digitizer Is Integral To The Claims Under *SiRF*, *ResearchCorp.*, And *CyberFone* ........ 28

*i.* *SiRF* ........ 28

*ii.* *Research Corp.* ........ 29

*iii.* *CyberFone* ........ 30

f. Scanner Integrality Defeats Comparison To *Glory* ........ 31

B. CET'S OPPOSITION ON CROSS-APPEAL ........ 32

I. STATEMENT OF THE CASE ........ 32

II. STATEMENT OF THE ISSUES ........ 35

III. SUMMARY OF THE ARGUMENTS ........ 35

IV. ARGUMENT ........ 36

1. CET's Suits Are Privileged Under *Noerr-Pennington* ........ 36

a. Sham Exception To Noerr-Pennington Does Not Apply Because Diebold Failed To Allege Intent To Inflict Collateral Injury ........ 38

*i.* *Diebold Failed To Allege That CET Intended "Harm"* ........ 42

*ii.* *CET Did Not Target Diebold* ........ 42

*iii.* *Diebold Failed To Allege Intent To Inflict Collateral Injury On Any Entity* ........ 44

Case: 13-1588 Document: 56 Page: 5 Filed: 04/28/2014

*iv.* *"Series of Legal Proceedings" Analysis Also Requires Intent To Inflict Collateral Injury* .......... 44

*v.* *Settlement Does Not Defeat Noerr-Pennington Immunity* .......... 47

2. Any Error In Dismissal Of Diebold's Tort Claims Is Harmless.......... 49

a. RICO Claim Fails For Lack Of Proximate Causation .......... 49

b. RICO Claim Fails Because Diebold Has Not Alleged Cognizable RICO Predicate Acts .......... 52

c. Tortious Interference Claims Are Barred By State Law Litigation Privileges .......... 55

C. CONCLUSION.......... 60

CERTIFICATE OF SERVICE .......... 61

CERTIFICATE OF COMPLIANCE.......... 62

**TABLE OF AUTHORITIES**

**Cases**

*Abbott Lab. v. Brennan*,
952 F.2d 1346 (Fed. Cir. 1991) ........ 37, 38

*Accenture Global Servs., GmbH v. Guidewire Software, Inc.*,
728 F.3d 1336 (Fed. Cir. 2013) ........ 11

*Am. Nursing Care of Toledo, Inc. v. Leisure*,
609 F.Supp. 419 (N.D. Ohio 1984) ........ 54

*Anza v. Ideal Steel Supply Corp.*,
547 U.S. 451 (2006) ........ 50, 51, 52

*ATD Corp. v. Lydall, Inc.*,
159 F.3d 534 (Fed. Cir. 1998) ........ 49

*Baglini v. Lauletta*,
768 A.2d 825, 338 N.J. Super. 282 (App. Div. 2001) ........ 57

*Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc.*,
796 F.2d 443 (Fed. Cir. 1986) ........ 7

*BE & K Const. Co. v. N.L.R.B.*,
536 U.S. 516 (2002) ........ 37

*Bixler v. Foster*,
596 F.3d 751 (10th Cir. 2010) ........ 53, 54

*Brooktree Corp. v. Advanced Micro Devices Inc.*,
977 F.2d 1555 (Fed. Cir. 1992) ........ 7

*CLS Bank Int'l v. Alice Corp.*,
717 F.3d 1269 (Fed. Cir. 2013) ........ *passim*

*Continental Can Co. v. Monsanto Co.*,
948 F.2d 1264 (Fed. Cir. 1991) ........ 6

*CyberFone Sys., LLC v. CNN Interactive Grp., Inc.*,
Nos. 2012-1673, 2014 WL 718153 (Fed. Cir. Feb. 26, 2014) ............................30

*CyberSource Corp. v. Retail Decisions, Inc.*,
654 F.3d 1366 (Fed. Cir. 2011) ............................27

*Deck v. Engineered Laminates*,
349 F.3d 1253 (10th Cir. 2003) ............................53

*Dow Chem. Co. v. Exxon Corp.*,
139 F.3d 1470 (Fed. Cir. 1998) ............................38

*Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*,
365 U.S. 127 (1961) ............................37

*Eon-Net LP v. Flagstar Bancorp*,
653 F.3d 1314 (Fed. Cir. 2011) ............................34

*Erickson v. Marsh & McLennan Co., Inc.*,
117 N.J. 539 (1990) ............................55, 56

*First Pacific Bancorp, Inc. v. Bro*,
847 F.2d 542 (9th Cir. 1988) ............................54

*G-I Holdings, Inc. v. Baron & Budd*,
179 F.Supp.2d 233 (S.D.N.Y. 2001) ............................54

*Globetrotter Software, Inc. v. Elan Computer Group, Inc.*,
362 F.3d 1367 (Fed. Cir. 2004) ............................37

*Glory Licensing LLC v. Toys "R" Us, Inc.*,
No. 09-4252, 2011 WL 1870591 (D.N.J. May 16, 2011) ............................31

*Harper & Row Publishers, Inc. v. Nation Enters.*,
471 U.S. 539 (1985) ............................23

*Hawkins v. Harris*,
141 N.J. 207 (1995) ............................55, 56, 57

*Heights Cmty. Cong. v. Smythe, Cramer Co.*,
862 F.Supp. 204 (N.D. Ohio 1994) ............................54

Case: 13-1588 Document: 56 Page: 8 Filed: 04/28/2014

*Hemstreet v. Spiegel, Inc.*,
851 F.2d 348 (Fed. Cir. 1988) ....................48

*Holmes v. Securities Investor Protection Corp.*,
503 U.S. 258 (1992) .................... 49, 50, 51

*In re Alappat*,
33 F.3d 1526 (Fed. Cir. 1994) ....................7

*In re Bergy*,
563 F.2d 1031 (C.C.P.A. 1977) ....................7

*In Re Bill of Lading Transmission. & Processing Sys. Patent Litig. (R+L Carriers, Inc. v. Drivertech LLC)*,
681 F.3d 1323 (2012) ....................9

*In re Bilski*,
545 F.3d 943 (Fed. Cir. 2008) ....................7

*Interactive Gift Express, Inc. v. Compuserve, Inc.*,
256 F.3d 1323 (Fed. Cir. 2001) ....................1, 2

*I.S. Joseph Co. v. J. Lauritzen A/S*,
751 F.2d 265 (8th Cir. 1984) ....................54

*Jacob B. v. County of Shasta*,
40 Cal.4th 948, 154 P.3d 1003 (2007) ....................57

*Jones v. Hardy*,
727 F.2d 1524 (Fed. Cir. 1984) .................... 6, 31

*Lindes v. Sutter*,
621 F. Supp. 1197 (D.N.J. 1985) ....................58

*Livingston Downs Racing Ass'n Inc. v. Jefferson Downs Corp.*,
192 F. Supp. 2d 519 (M.D. La. 2001) .................... 44, 45, 46, 47

*Mayflower Industries v. Thor Corp.*,
15 N.J. Super. 139, 83 A.2d 246 (Ch. Div. 1951), *aff'd*, 9 N.J. 605, 89 A.2d 242 (1952) ....................58

*McZeal v. Sprint Nextel Corp.*,
501 F.3d 1354 (Fed. Cir. 2007) .......... 9

*Microsoft Corp. v. i4i Ltd. P'ship*,
--- U.S. ----, 131 S.Ct. 2238, 180 L.Ed.2d 131 (2011) .......... 7

*Mirror Worlds, LLC v. Apple Inc.*,
692 F.3d 1351 (Fed. Cir. 2012) .......... 3

*Myers v. American Dental Ass'n*,
695 F.2d 716 (3rd Cir. 1982) .......... 14, 15

*Nobelpharma AB v. Implant Innovations, Inc.*,
141 F.3d 1059 (Fed. Cir. 1998) .......... 39

*N.V. Akzo v. E.I. DuPont de Nemours & Co.*,
810 F.2d 1148 (Fed. Cir. 1987) .......... 8

*Pac. Gas & Elec. Co. v. Bear Stearns & Co.*,
50 Cal.3d 1118 (1990) .......... 58, 59

*Paulus v. Bob Lynch Ford, Inc.*,
139 Cal. App. 4th 659, 43 Cal. Rptr. 3d 148 (Cal. Ct. App. 2006) .......... 59

*Penwag Property Co., Inc. v. Landau*,
76 N.J. 595, 388 A.2d 1265 (1978) .......... 59

*Primetime 24 Joint Venture v. National Broadcasting Co.*,
219 F.3d 92 (2d Cir. 2000) .......... 44, 46, 47

*Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc. (PRE)*,
508 U.S. 49 (1993) .......... 37, 38, 39

*Rainier's Dairies v. Raritan Valley Farms, Inc.*,
19 N.J. 552, 117 A.2d 889 (1955) .......... 56, 57

*Research Corp. Tech., Inc. v. Microsoft Corp.*,
627 F.3d 859 (Fed. Cir. 2010) .......... 28, 29, 30

Case: 13-1588 Document: 56 Page: 10 Filed: 04/28/2014

*Rodime PLC v. Seagate Technology, Inc.*,
174 F.3d 1294 (Fed. Cir. 1999) .....................................................................37

*Rosenthal v. Irell & Manella*,
135 Cal.App.3d 121, 185 Cal.Rptr. 92 (1982) ...................................................57

*Ruberton v. Gabage*,
280 N.J. Super. 125 (App.Div.1995)...................................................................56

*Sanofi-Aventis v. Apotex Inc.*,
659 F.3d 1171 (Fed. Cir. 2011) .........................................................................48

*SBK Catalogue Partnership v. Orion Pictures Corp.*,
723 F. Supp. 1053 (D.N.J. 1989)........................................................................59

*Semiconductor Energy Laboratory Co., Ltd. v. Samsung Electronics Co., Ltd.*,
204 F.3d 1368 (Fed. Cir. 2000) ............................................................ 37, 38, 54

*Shelcore, Inc. v. Durham Indus.*,
745 F.2d 621 (Fed. Cir. 1984) ..............................................................................6

*Silberg v. Anderson*,
50 Cal.3d 205, 266 Cal. Rptr. 638, 786 P.2d 365 (1990)............................. 55, 57

*SiRF Tech, Inc. v. ITC*,
601 F.3d 1319 (Fed. Cir. 2010) ..................................................................... 28, 29

*SmartGene, Inc. v. Advanced Biological Laboratories, SA*,
No. 2013-1186, 2014 WL 259824 (Fed. Cir. 2014)..................................... 25, 26

*Sosa v. DirecTV, Inc.*,
437 F.3d 923 (9th Cir. 2006) ...............................................................................37

*Ultramercial, Inc. v. Hulu, LLC*,
722 F.3d 1335 (Fed. Cir. 2013) ..................................................................... 15, 21

*United Mine Workers v. Pennington*,
381 U.S. 657 (1965) ........................................................................................ 36, 37

*United States v. Pendergraft*,
297 F.3d 1198 (11th Cir. 2002) ...........................................................................54

*USS-POSCO Indus. v. Contra Costa County Bldg. & Construction Trades Council*, 31 F.3d 800 (9th Cir. 1994) .......... 44, 45, 46, 47

*Vemco, Inc. v. Camardella*, 23 F.3d 129 (6th Cir. 1994) .......... 54

*Warner-Lambert Co. v. Teva Pharms. USA, Inc.*, 418 F.3d 1326 (Fed. Cir. 2005) .......... 1

*Weissburg v. Lancaster School Dist.*, 591 F.3d 1255 (9th Cir. 2010) .......... 2

*Wenger Mfg., Inc. v. Coating Machinery Systems, Inc.*, 239 F.3d 1225 (Fed. Cir. 2001) .......... 12

*Yee v. City of Escondido, Cal.*, 503 U.S. 519 (1992) .......... 2

**Constitution**

U.S. Const. amend. I .......... 36, 38, 40

**Statutes**

18 U.S.C. §1951 (Hobbs Act) .......... 53, 54, 55

18 U.S.C. §1961(1)(A) .......... 53

18 U.S.C. §1964(c) .......... 49

35 U.S.C. §101 .......... 7, 8, 26, 34

35 U.S.C. §102 .......... 34

35 U.S.C. §103 .......... 34

35 U.S.C. §112 .......... 34

35 U.S.C. §121 .......... 18

35 U.S.C. §282 .......... 4, 7, 9, 14

35 U.S.C. §282(a) ....................................................................................................6

**Rules**

Fed. R. Civ. P. 11 ..................................................................................................34

Fed. R. Civ. P. 12(b)(6)..........................................................................................10

Fed. R. Civ. P. 24(a)...............................................................................................52

Fed. R. Civ. P. 201(b)(2)..........................................................................................3

Fed. R. Civ. P. 201(c)...............................................................................................3

Local Patent Rule 3.1. .................................................................................... 10, 16

Local Patent Rule 3.3. ............................................................................................10

N.J. L.Civ.R. 9.3. ........................................................................................... 10, 16

**Regulations**

37 C.F.R. §1.141(a)................................................................................................18

Case: 13-1588 Document: 56 Page: 13 Filed: 04/28/2014

## A. CET'S REPLY ARGUMENTS ON APPEAL[1]

### 1. <u>CET Has Preserved All Patent-Eligibility Arguments</u>

Wells Fargo and PNC (collectively the "Appellee Banks") contend that CET did not raise below a number of points regarding patent-eligibility and consequently waived these points. The purportedly new arguments include: (1) reliance on the Examiner's statement of Reasons for Allowance of the '855 patent (Bank's Br. 10 n.3); (2) arguments regarding the *transferring* limitations (Bank's Br. 11 n.5); and (3) CET's "preemption" analysis (Banks' Br. 31). The Appellee Banks cite a number of cases of this Court, including *Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323 (Fed. Cir. 2001) (Bank's Br. 19-20). Diebold similarly contends (Diebold Br. 43 n.6) that reliance on the statement of Reasons for Allowance is a new argument. Diebold additionally contends that CET's arguments regarding "certain terms" should not be entertained for the first time on appeal. (Diebold Br. 22-23).

The waiver doctrine may apply to failure to argue claims or issues below, but additional arguments in support of a claim or issue raised below are not waived. *Interactive Gift Express*, 256 F.3d at 1346; *see also Warner-Lambert Co. v. Teva Pharms. USA, Inc.*, 418 F.3d 1326,1338 n.11 (Fed. Cir. 2005) (a party

---

[1] In this section, CET responds to the patent-eligibility arguments in (1) PNC and Wells Fargo's Brief ("Banks' Br."), and (2) Diebold's Brief ("Diebold Br.").

Case: 13-1588 Document: 56 Page: 14 Filed: 04/28/2014

preserved all enablement arguments for appeal by raising "the general issue of enablement" in the trial court).

The Supreme Court's jurisprudence is the same: once a claim is properly presented, a party may make any argument in support of the claim. *Yee v. City of Escondido, Cal.*, 503 U.S. 519, 534 (1992) ("[P]arties are not limited to the precise arguments they made below.") "[T]he Supreme Court has made clear [that] it is claims that are deemed waived or forfeited, not arguments." *Weissburg v. Lancaster School Dist.*, 591 F.3d 1255, 1260 n.3 (9th Cir. 2010) (brackets in original).

Further, this Court has the discretion to consider waived arguments. *Interactive Gift Exp.*, 256 F.3d at 1344.

In the District Court, CET had generally argued that the claims of the Patents-in-Suit are patent-eligible (A239-A256). CET had argued that the limitations of the claims should not be ignored in determining patent-eligibility (A236, A240, A243, A248, A249, A252), that appropriate factual development is required in determining the scope of the claims (A240-A243, A250), that claim-by-claim analysis should be performed (A236, A240, A258), and that all the claims of the Patents-in-Suit are patent-eligible (A239-A256).

CET specifically argued that the District Court should have considered the file histories of the Patents-in-Suit (A233, A241), which include the statement of

Reasons for Allowance and are judicially noticeable.[2] CET also specifically argued that the District Court should have construed and considered the “transferring” limitations, and a host of other limitations. (A238, A240, A243, A252).

The contention regarding the purported waiver of the arguments based on file history is not made in either the Diebold Brief or the Banks’ Brief, apart from passing footnote references. Bank’s Br. 10 n.3; Diebold Br. 43 n.6. Such references in footnotes do not sufficiently develop arguments and do “not sufficiently preserve the issue for appeal.” *Mirror Worlds, LLC v. Apple Inc.*, 692 F.3d 1351, 1358 (Fed. Cir. 2012).

The so-called “scope of preemption” arguments deal with the manner in which different limitations relate to the coverage of each claim and consequently affect its scope and patent-eligibility. They have been part and parcel of CET’s arguments below. (A239-A256). CET’s reason for emphasizing the “scope of preemption” is this Court’s opinions in *CLS Bank Int’l v. Alice Corp.*, 717 F.3d 1269 (Fed. Cir. 2013) (en banc), which became available after the briefing on PNC’s motion. In *CLS Bank*, a majority of the Judges of this Court underscored the importance of “preemption analysis.” *E.g., CLS Bank*, 717 F.3d at 1279. CET chose not to ignore this Court’s latest guidance on the issue central to this case.

---

[2] Fed. R. Civ. P. 201(b)(2) & (c).

Case: 13-1588 Document: 56 Page: 16 Filed: 04/28/2014

CET has preserved the right to make all patent-eligibility arguments.

**2. <u>The District Court's Errors In Holding Hundreds Of Claims Invalid Without Claim-By-Claim Analysis And Without Factual Inquiry Were Prejudicial</u>**

Diebold and the Appellee Banks also contend that CET has not demonstrated that the errors of the District Court were prejudicial. (Bank's Br. 20, 45; Diebold Br. 16, 30). The errors are outcome determinative and, if allowed to stand, would deprive CET of its property, all the claims of the Patents-in-Suit and the damages for their infringement.

This is not a case where the District Court was presented with multiple grounds for granting a motion to dismiss, and where alternative grounds for granting the motion are clear. PNC asserted a single ground of invalidity: lack of patent-eligibility based on the "abstract idea" exception. As long as the District Court's errors infected its finding of invalidity on the sole ground asserted, the errors were *prima facie* prejudicial.

**3. <u>The District Court Erred By Not Requiring PNC To Establish Invalidity On A Claim-By-Claim Basis</u>**

CET argued that each claim carries a presumption of independent validity, and therefore grounds of invalidity must be analyzed claim-by-claim. CET Br. 12, 13, 20-23. CET cited the governing statute, 35 U.S.C. §282, and a number of cases in support of the presumption, both from this Court and the Supreme Court. Although the presumption and the claim-by-claim analysis requirement are well

Case: 13-1588 Document: 56 Page: 17 Filed: 04/28/2014

established, Diebold and the Appellee Banks take issue with these basic tenets of patent law.

First, the Appellee Banks and Diebold generally contend that PNC was not required to establish invalidity of each claim, and that the District Court was not required to engage in claim-by-claim analysis, because the claims issued on substantially the same specifications.[3] Second, they contend that once PNC alleged that the claims are "similar" – without any explanation or analysis of similarity – the burden shifted to CET to distinguish the individual claims, and CET failed to do so.[4] Third, they contend that CET lost its right to claim-by-claim construction by (i) not listing in the PNC complaint the specific asserted claims, and not amending the complaint, (ii) not moving for accelerated discovery and claim construction, (iii) summarizing the subject matter in CET's Opening Brief, and (iv) mentioning (although not asserting) two additional patents in the PNC complaint.[5] Diebold additionally contends that (v) PNC could not have engaged in a claim-by-claim attack given the page limitations imposed by the Local Rules of the District Court.[6] CET responds to these contentions in order.

---

[3] Banks' Br. 3 & n.1, 17, 18, 39; Diebold Br. 26.

[4] Banks Br.' 3, 18, 40; Diebold Br. 11, 24-27, 32.

[5] Banks' Br. 3-4 n.1, 40 n.16; Diebold Br. 24, 25, 27, 28.

[6] Diebold Br. 25.

Case: 13-1588 Document: 56 Page: 18 Filed: 04/28/2014

### a. Invalidity Must Be Established Claim-By-Claim

The presumption of independent validity of each claim is a clear statutory imperative:

> A patent shall be presumed valid. Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim. The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity.

35 U.S.C. §282(a). As this Court has consistently proclaimed, each claim defines a separate invention and stands or falls independent of any other claims. *E.g.*, *Jones v. Hardy*, 727 F.2d 1524, 1528 (Fed. Cir. 1984); *Shelcore, Inc. v. Durham Indus.*, 745 F.2d 621, 625 (Fed. Cir. 1984); *Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1266-67 (Fed. Cir. 1991). CET cited these and other cases in its Opening Brief. The Appellee Banks have ignored these cases. Diebold has ignored all but one of them, *Shelcore*. Diebold distinguishes *Shelcore* based on the type of invalidity asserted;[7] in *Shelcore*, the district court invalidated claims over prior art, unlike the invalidation based on patent-eligibility in the present case.

No logic supports this distinction: not the governing statute; not this Court's decisions; not the rationale underlying the presumption. To the contrary, this Court's recent pronouncements leave no doubt that the presumption of independent

---

[7] Diebold Br. 26-27.

Case: 13-1588 Document: 56 Page: 19 Filed: 04/28/2014

validity and the claim-by-claim analysis requirement apply in the patent-eligibility context.

The statute does not list exceptions based on any grounds of invalidity, or any exceptions at all. It is a statute of general application, to all patents and all claims. The presumption of validity embodied in the statute is based in part on the expertise of patent examiners, who are presumed to have done their job as required. *Brooktree Corp. v. Advanced Micro Devices Inc.*, 977 F.2d 1555, 1574 (Fed. Cir. 1992); *see also Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc.*, 796 F.2d 443, 447 (Fed. Cir. 1986) (the Patent and Trademark Office should be given due deference).

Patent examiners routinely issue claim rejections based on lack of patent-eligibility. *E.g.*, *In re Bilski*, 545 F.3d 943 (Fed. Cir. 2008); *In re Alappat*, 33 F.3d 1526 (Fed. Cir. 1994); *In re Bergy*, 563 F.2d 1031 (C.C.P.A. 1977). The rationale underlying the presumption of validity is equally strong when the patent challenger contends invalidity under §101.

The caselaw "urge[s] a flexible, claim-by-claim approach to subject-matter eligibility that avoids rigid line drawing." *CLS Bank*, 717 F.3d at 1281 (opinion of Lourie, J.). The same plurality of Judges explicitly recognized:

> that all issued patent claims receive a statutory presumption of validity. 35 U.S.C §282; *Microsoft Corp. v. i4i Ltd. P'ship*, —— U.S. ——, 131 S.Ct. 2238, 180 L.Ed.2d 131 (2011). And, as with

Case: 13-1588 Document: 56 Page: 20 Filed: 04/28/2014

> obviousness and enablement, that presumption applies when §101 is raised as a basis for invalidity in district court proceedings.

*Id.* at 1284. Four additional Judges of this Court were inclined to hold that the presumption of validity applies to patent-eligibility challenges: "we believe the presumption of validity applies to all challenges to patentability, including those under Section 101 and the exceptions thereto, . . . ." *Id.* at 1304 (opinion of Rader, J.).

Diebold contends that where "representative" claims are shown to be invalid, and there is no indication that other claims contained other limitations that might have led to a different result, the invalidation of all claims is proper, and cites *N.V. Akzo v. E.I. DuPont de Nemours & Co.*, 810 F.2d 1148 (Fed. Cir. 1987). *Akzo*, however, was decided not only after full factual development, but after a trial. *Akzo*, at 1151. The evidence at the *Akzo* trial showed that the patent examiner considered a certain limitation ("at least 5% CaCl2") to be critical to the validity of "each and every one of the claims" of the patent. *Akzo*, at 1151; *see* also *id*. at 1152 (the limitation was "included in each claim"). "[T]he court was persuaded by evidence presented [by the accused infringer] at the trial" that the limitation in fact carried "no patentable significance." In other words, the evidence at the trial indicated that the ground for allowing each claim was faulty.

The district court in *Akzo* did address the patentability of each claim, and had done so after claim construction and a trial.

The fact that the four patents had substantially similar specifications is of no consequence to the claim-by-claim analysis requirement. As section 282 clearly contemplates, typically all the claims are found in the same patent, and have issued on the same specification. The requirement of claim-by-claim analysis *per force* applies to the claims of different patents.

**b. PNC Never Rebutted Presumption Of Validity Claim-By-Claim**

The Appellee Banks contend that CET never distinguished "even one claim from among the 242 claim asserted claims from the method that PNC Bank alleged . . . to be encompassed in all the claims," but "merely argued" that it was not required to do so in the PNC Complaint.[8]

It is true that CET has consistently argued that it was not required to identify asserted claims in the PNC complaint. On this point, the law is settled. Form 18 of the Appendix of Forms to the Federal Rules of Civil Procedure includes a sample patent infringement complaint, which does not require identification of asserted claims. Satisfying the requirements of the Form is sufficient to state a cause of action for patent infringement. *In Re Bill of Lading Transmission. & Processing Sys. Patent Litig. (R+L Carriers, Inc. v. Drivertech LLC)*, 681 F.3d 1323, 1334 & n.5 (2012) (*citing McZeal v. Sprint Nextel Corp.*, 501 F.3d 1354, 1357 (Fed. Cir. 2007)). The Local Rules of the District Court specify the timing

8 Banks' Br. 3; *see also id.* 18, 40.

Case: 13-1588 Document: 56 Page: 22 Filed: 04/28/2014

and manner for asserting claims in patent infringement actions, just as they specify the timing and content of invalidity contentions.[9] Both procedures should have been followed. They were not, because PNC chose to make its Rule 12(b)(6) motion which is the subject of this Appeal.

CET separately argued patent-eligibility of claims 20 and 43 of the '416 Patent in the District Court. (A239 n.8) CET also argued separate patent-eligibility of claim 2 of the '465 patent, and of all other claims reciting "means." (A236 & n.6)

While CET specifically argued that all claims are inextricably tied to a "digitizing unit" or to a "scanner" (A233-A259 *passim*), some claims do not <u>expressly</u> recite "digitizing unit" or "scanner."[10] Other claims do recite expressly either a "digitizing unit" or a "scanner."[11] It may be that the express (instead of implied or inherent) recitation of a "scanner" or a "digitizing unit" affects patent-

---

[9] N.J. L.Civ.R. 9.3 (Local Patent Rules 3.1 & 3.3).

[10] This is the case with the two claims that PNC discussed in support of the motion to dismiss in the District Court.

[11] *E.g.*, claims 37-44, 54-61, and 70-77 of the '855 Patent (A114, A115); claims 39-46 of the '508 Patent (A141); and claims 1-53 of the '465 Patent (A162–A172).

Case: 13-1588 Document: 56 Page: 23 Filed: 04/28/2014

eligibility.[12] CET has clearly preserved the separate argument regarding the apparatus claims that expressly recite "scanner" or "digitizing unit" limitations.[13]

The Appellee Banks now say that where system claims are "virtually indistinguishable" from the method claims that have been invalidated as abstract (and not appealed), the system claims are also invalid, Banks' Br. 44, and cite *Accenture Global Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336 (Fed. Cir. 2013).

In *Accenture*, the claims were invalidated on a summary judgment, after at least some factual development. *Id.* at 1337. In *Accenture*, there was some basis for holding that the language of the system claim "mirrors the language of the method" claim. *Id.* at 1340. The present record lacks any comparison of the different claims, any factual development, any discussion of all but two of the claims, any construction of claim terms. It does not support the District Court's finding that all 242 claims are "substantially similar and linked to the same abstract idea." (A12) Even if there were support for the "substantially similar and linked to the same abstract idea" proposition, it would not force the conclusion that the claims are "virtually indistinguishable" for patent-eligibility analysis.

---

[12] The law of patent-eligibility of computer-based inventions is unsettled. *CLS Bank*, 717 F.3d 1269.

[13] The District Court may have accepted that the claims require a scanner or a similar digitizer, but utterly ignored scanner operation and the resulting output.

Case: 13-1588 Document: 56 Page: 24 Filed: 04/28/2014

The District Court believed that it was "free to dispose of the additional claims in a less detailed fashion." (A12) The "less detailed fashion" apparently meant no analysis at all of the 240 claims – there is none in the District Court's opinion. (A3-A26) Neither the Banks' Brief nor Diebold Brief points out such analysis in the District Court's opinion.

The presumption of independent validity of each claim must have some consequence. At the very least, it puts the burden of initially proceeding with establishing invalidity on the patent challenger. PNC's statement that the claims are "substantially similar" could not shift the burden to CET. And neither Diebold Brief nor the Banks' Brief disputes that PNC did not attempt to argue invalidity of the vast majority of claims.

If a simple statement that the claims are "substantially similar" were all it took to defeat the presumption of independent validity, the presumption would be a nullity. There is always some similarity of claims of the same patent; each claim is related to the specification, the drawings, the prior art, and to other claims. According to the doctrine of claim differentiation, however, "each claim in a patent is presumptively different in scope." *Wenger Mfg., Inc. v. Coating Machinery Systems, Inc.*, 239 F.3d 1225, 1233 (Fed. Cir. 2001). *Per force*, each of the 242 claims of four patents should be presumed to have a different scope. At the pleading stage, before formal or informal claim construction – before any factual

Case: 13-1588 Document: 56 Page: 25 Filed: 04/28/2014

development – the presumption cannot be overcome by a naked statement that the claims are "substantially similar," a statement made without any discussion, without any explanation of why the claims are similar, or what is meant by "similar."

PNC never engaged in a claim-by-claim analysis. Neither did the District Court. It was a prejudicial, reversible error.

**c. CET Did Not Waive Claim-By-Claim Construction**

The Appellee Banks and Diebold defend the procedure below by saying that CET lost its right to claim-by-claim analysis through various actions and inactions, and that the page limitations in the District Court absolved PNC's failure to show invalidity of each claim.

***i. Patentee Is Not Required To Identify Asserted Claims In Pleading***

As discussed above in more detail, Form 18 of the Appendix of Forms does not require patentees to identify the specific claims that are infringed. The Local Rules of the District Court specify the timing and manner for selecting and asserting patent claims. The contention that CET waived the claim-by-claim process by not identifying specific claims in its initial pleading is nonsense.

Case: 13-1588 Document: 56 Page: 26 Filed: 04/28/2014

### *ii. CET Asked The District Court To Allow Some Factual Development*

CET argued strenuously that factual development, including construction of at least some claim terms, was indispensable. ( A233, A236-A243, A252, A260) There was no need for a formal motion for accelerated discovery, certainly not before PNC even answered the Complaint, and not with PNC's motion already pending. More to the point, the burden was squarely on the accused infringer to establish invalidity, not on the patentee to prove validity. As long as there was a need for any factual development, PNC could not have satisfied its burden at the pleading stage.

### *iii. Brief Page Limitations Do Not Eliminate Claim-by-Claim Analysis Requirement*

Diebold observes that PNC could not have reproduced all 242 claims in the District Court, "in a brief limited to 40 pages using a large font."[14] This true observation also applies to CET's ability to argue validity of each of the claims. It is also true that a request to increase the page limit may be granted for good reason.

But none of this matters to the statutory presumption of independent validity of each claim, and to the allocation of procedural and substantive burdens. The law puts the burden to establish invalidity on the accused infringer. 35 U.S.C. §282; *see Myers v. American Dental Ass'n*, 695 F.2d 716, 724 (3rd Cir.

---

[14] Diebold Br. 25.

Case: 13-1588 Document: 56 Page: 27 Filed: 04/28/2014

1982) ("the movant has the burden of proving the affirmative defense asserted by it").

PNC had the burden to establish invalidity of each claim. It did not do so. The District Court also failed to perform claim-by-claim analysis. The invalidation of 242 claims without a claim-by-claim analysis was error and should be reversed.

### 4. The District Court Erred By Short-Circuiting All Factual Exploration Before Deciding Patent-Eligibility

CET has argued that the need for findings of fact on a properly developed factual record is compelling. This Court has made it abundantly clear that "it will be rare that a patent infringement suit can be dismissed at the pleading stage for lack of patentable subject matter." *Ultramercial, Inc. v. Hulu*, LLC, 722 F.3d 1335, 1338 (Fed. Cir. 2013) ("*Ultramercial II*") (internal citations omitted). Diebold notes that rare does not mean never (Diebold Br. 28), but does not explain what makes this case the "rare" candidate for deviation from the general rule requiring *some* factual exploration before addressing claim validity.

The Patents-in-Suit have many claims with many limitations – limitations that neither PNC nor the District Court examined – including *transferring, said converted text data*, all *template*-related limitations (including the way of creating the template), and *matching . . . with a template*. There are limitations that may raise the presumption of means-plus-function construction (*e.g.*, "a symbol

Case: 13-1588 Document: 56 Page: 28 Filed: 04/28/2014

detection means"). All of that requires some factual development, some conception of the way a person skilled in the art would have understood the claims.

The sheer number of claims militates against examining patent-eligibility at the pleading stage. The Local Rules of the District Court mandate disclosure of asserted claims and infringement contentions.[15] The number of claims that need to be examined is routinely reduced to a reasonable number by the disclosure of the asserted claims.

The Patents-in-Suit are directed to technological improvements in computer arts, where expert understanding is typically required. They do not belong to the class of patents that recite manipulation (or creation) of purely business concepts (investments, taxes, finances, legal obligations, valuations, property exchanges), where lay understanding may often suffice. Technological improvements call for a technologist's understanding.

The large number of claims in the four patents, the technological nature of the subject matter of the patents, and the limitations with meaning not clear to those not skilled in the art and which may implicate means-plus-function construction all point to the need for factual exploration to understand the claims.

---

[15] The Local Rules of the District Court require the disclosure of the asserted claims and the infringement contentions "[n]ot later than 14 days after the initial Scheduling Conference." N.J. L.Civ.R. 9.3 (Local Patent Rule 3.1). The District Court dismissed CET's case against PNC before the scheduling conference.

Case: 13-1588 Document: 56 Page: 29 Filed: 04/28/2014

Neither Diebold nor the Appellee Banks offer any reasons why this might be the "rare" case to deviate from the usual rule requiring factual exploration before addressing validity.

Diebold and the Appellee Banks contend (Diebold Br. 26, Banks' Br. 5, 6) that the District Court correctly determined that the claims are "substantially similar and linked to the same abstract idea" and the "basic character of the claimed subject matter in dispute . . . is clearly evident to the Court." But the District Court's analysis supporting the "substantially similar" and "basic character of the claimed subject matter" findings is nowhere to be found. The Appellee Banks do not point out such analysis in the District Court's opinion, and neither does Diebold. We have not found such analysis, not even a superficial explanation of why all 242 claims of the same patent are "substantially similar." It is neither in PNC's brief in support of the motion, nor in the District Court's opinion.

The significance of the "substantially similar" finding is meaningless in the context of claim analysis. All claims in a single patent should be "similar" in some sense, because they issued on the same application, which application was not "restricted" by the patent examiner. When claims of a single patent application are directed to "independent and distinct inventions," the application is typically restricted and applicant may pursue each invention in separate patent applications: "If two or more independent and distinct inventions are claimed in one application,

Case: 13-1588 Document: 56 Page: 30 Filed: 04/28/2014

the Director may require the application to be restricted to one of the inventions." 35 U.S.C. §121. With some exceptions, "Two or more independent and distinct inventions may not be claimed in one national application, . . . ." 37 C.F.R. §1.141(a). All claims of a typical patent are "substantially similar" in some sense. But "substantially similar" does not mean that the claims are not distinct for patent-eligibility purposes. The District Court's statement regarding the "basic character of the claimed subject matter" is likewise unsupported by any analysis of the "basic character." None of these statements is based on any facts discernible from the record. None of these statements is a substitute for analysis and understanding of the claim limitations.

Diebold and the Appellee Banks urge that the District Court recognized the need to construe the claims in a manner most favorable to CET, and did so. Diebold Br. 11, 22; Banks' Br. 5-6, 7 n.2, 14-16, 34-35, 37. Diebold refers to the District Court's discussion of the "digitizing unit" versus a "scanner," but does not say where the "most favorable" construction may be found for any other limitation. The Appellee Banks similarly point to the District Court's discussion of the effect of the computer and the scanner on the machine prong of the Machine-or-Transformation (MOT) test. The District Court did not consider any of the other limitations (including the *transferring*, *converted text data*, *template*-related limitations, *matching . . . with a template, symbol detection means, recognizing*

Case: 13-1588    Document: 56    Page: 31    Filed: 04/28/2014

*portions*, and *receiving output . . . from an automated digitizing unit* limitations). The District Court ignored all these limitations and summarily concluded that the "breadth of the Patents-in-Suit is staggering . . . ." The District Court applied the "staggering" characterization not to the breadth of any particular claim or claims, or to the "claimed subject matter," but to "the Patents-in-Suit," and did so without analyzing the specific limitations of even the two claims that PNC quoted in the proceedings below.

Is the "symbol detection means" in claim 2 of the '465 patent a "means-plus-function" limitation? If so, what portions of the specification are relevant to determining its meaning? What would a person of skill in the art ("POSITA") have understood to be the "symbol detection means"? What is a "template"? How is it created? What is involved in "transferring" data? No answers to these questions appear in the District Court's opinion.

Regarding the scanner and computer limitations, the District Court rejected CET's construction that the recited steps (such as recognizing characters and fields in the pixel bit stream) are qualitatively different from those that can be performed by a person in manipulating information. Instead, the District Court adopted PNC's construction: "Simply stated, gathering information from a hardcopy document can be done by hand and manually input into a general purpose computer." (A22) This was not the construction most favorable to CET.

Case: 13-1588 Document: 56 Page: 32 Filed: 04/28/2014

The District Court's finding that described the supposedly "invalid abstract idea" is also unsupported by any meaningful analysis. The District Court never explained what makes an abstract idea "invalid," but did describe the idea in these words: "the Patents-in-Suit . . . attempt to patent the abstract idea of extracting information from a hardcopy document, recognize certain information on that document and save certain user selected information in computer memory." The District Court never explained what facts of record make the idea "invalid," or how the purported "invalidity of the idea" affects the patent-eligibility analysis. The District Court's opinion contains no explanation or analysis of the claims that could support the finding that the idea of all 242 claims is the same one the District Court described. The District Court's holding itself indicates that some findings of fact are necessary for patent-eligibility analysis.

The District Court's summary of the "Patents-in-Suit" is revealing:

> the Patents-in-Suit focus on the processing of information in a three step process. First, information or data from a hard copy document is gathered by an "automated digitizing unit," such as a scanner, into computer memory. Second, the information gathered by the scanner is recognized as corresponding to certain data fields. Third, the information corresponding to the data fields on the hard copy documents are then stored in corresponding data fields in computer memory.

(A5) The Appellee Banks relied heavily on this verbiage, quoting it four times. Banks' Br. 4, 9, 36-37, 38. In the quotation, the District Court speaks of "Patents-in-Suite" and their "focus" – not of individual claims or claim limitations. This is

Case: 13-1588 Document: 56 Page: 33 Filed: 04/28/2014

not an analysis but a summary conclusion. It is no substitute for considering the claim limitations.

We are confident that the patent examiner who allowed the Patents-in-Suit did not consider the sum total of all the limitations of the 242 claims of the four different patents to be amenable to the compact and convenient description quoted above.

**5. <u>The Claims Are Patent-Eligible</u>**

We now respond to the contentions regarding the substantive issue of patent-eligibility.

**a. <u>Claims Do Not Preempt A Fundamental Concept</u>**

In the Opening Brief, CET argued that the scope of the claims does not approach the preemption of the "fundamental concept" or "invalid abstract idea" that the District Court identified as being "encapsulated" in the claims. CET Br. 34-42.

A number of Judges of this Court described the scope of preemption analysis as an inquiry relevant to the analysis of claims under the "abstractness" exception to patent-eligibility. *E.g.*, *Ultramercial II*, 722 F.3d at 1352; *id*. at 1355 (Lourie, J., concurring) (citing *CLS Bank*, 717 F.3d at 1282). The analysis focuses on identifying the fundamental concept wrapped up in a particular claim, and then evaluating the balance of the claim "to determine whether it contains additional

Case: 13-1588 Document: 56 Page: 34 Filed: 04/28/2014

substantive limitations that narrow, confine, or otherwise tie down the claim so that, in practical terms, it does not cover the full abstract idea itself." *CLS Bank* at 1281-82.

The Appellee Banks correctly set forth the preemption analysis (Banks' Br. 32), and then neglect to analyze the scope of preemption of any claim. Instead, they contend that determining the scope of preemption of claims is irrelevant, because "[e]very patent preempts others from practicing the subject matter that falls within the scope of its claims." *Id.* 32 n.14. Diebold presents the same contention. Diebold Br. 12, 43-44.

Without determining the scope of claim coverage one cannot tell what a claim preempts. The pertinent question under the preemption approach is: Does a particular claim extend to cover practically all of the abstract idea? This question is answered by comparing the scope of the claim to the abstract idea. In the opening brief, CET has shown that many claims are truly narrow as compared to the supposedly "invalid abstract idea" identified by the District Court. CET Br. 34-42.

Further, the "preemption approach" should be applied to individual claims, not to all the claims taken together or "claimed subject matter" as a whole. This Court's decisions do not suggest that patent-eligibility of <u>one claim</u> depends on the scope of <u>other claims</u>.

Case: 13-1588 Document: 56 Page: 35 Filed: 04/28/2014

In the District Court, PNC never applied the preemption analysis to any claim. This is understandable, because the briefing preceded *CLS Bank*. But in the present Appeal, Diebold's and PNC's failure to respond to CET's preemption analysis speaks volumes. "Silence implies assent." *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 572 (1985).

**b. <u>CET's Claims Are Not Directed To Mental Steps</u>**

As CET has argued in the Opening Brief, the claims are directed to labor saving methods that do not duplicate the steps that can be performed by a human being, be it mentally or with a pen and paper. CET Br. 11, 13, 28-34. Diebold responds that " . . . all the remaining steps in CET's claims were done by humans before the age of computers, and are done by humans today," referring to bank deposit processing. Diebold Br. 39; *see also id.* 34, 37, 45 (implying that the methods of the Patents-in-Suit can "be performed entirely in a human's mind.") The Appellee Banks likewise say that the steps are "indisputably mental steps." Banks' Br. 11-12, 27 n.10. The Appellee Banks further say that the steps are like those "that banks have been performing [in the course of check-clearing services] manually for close to a century." *Id*. 13; *see also id*. 23-24, 26, 27, 30, 31 n.13, 33. They contend that this conclusion is bolstered by CET's statement that the patented technology reduces or eliminates "labor and delays from manual processing of

Case: 13-1588 Document: 56 Page: 36 Filed: 04/28/2014

information embedded in the ink and paper of the hard copy documents." Banks' Br. 13.

First, whether mental processes are recited is an issue of fact. The District Court had no file history or any extrinsic evidence that would have allowed it to resolve this issue. Second, Diebold and the Appellee Banks confound the end result (check deposit processing) with the means used to accomplish it.

Check deposit processing can be performed manually. Automated check deposit through ATMs and mobile devices cannot. It is not simply the natural result of "computerization." The processing of the information on the checks is not merely computerized with the computer duplicating human functions in the same manner that a person would perform them. The processing is performed in a way that is qualitatively different. While written numbers on a paper document are instantly recognizable to a human eye, they are not so recognizable to a computer. To process the information with a computer, the paper document is digitized, so that the ink embedded in the paper is converted into pixels, which are provided to the computer as a stream of bits corresponding to the colors and shades of the individual pixels. This information is not meaningful to the human eye. With complicated processing, a computer may recognize within the bit stream patterns of pixels that correspond to individual characters, and pre-determined fields of

Case: 13-1588 Document: 56 Page: 37 Filed: 04/28/2014

characters. The computer may manipulate the fields, transferring or transmitting the information in the fields in a targeted way.

CET has argued all this in the opening brief, and yet there is no response addressing the qualitative difference between automated processing and manual or mental processing. Both Diebold and the Appellee Banks apparently believe that as long as the end result of check processing is the same for human tellers and ATMs, the process is necessarily mental. PNC says that much: "A general purpose computer running software to automate a manual process is not 'specially-configured.'" Banks' Br. 13 n.7. With this approach, no computer-implemented method can be patent-eligible, because a computer computes, a function that can be performed in a human mind. All the patents in optical character recognition, handwriting recognition, speech recognition, encryption, facial recognition, textual analysis, would necessarily be invalid. Many others directed to labor saving technologies and implemented with a computer, would be suspect. Neither Congress nor the Supreme Court intended such a broad result – essentially a categorical exclusion of software-related patents.

This Court's decisions cannot be understood to mean that automating a process that can be performed by a person is necessarily ineligible for patent protection, regardless of how the steps of the process are performed. In *SmartGene, Inc. v. Advanced Biological Laboratories, SA*, No. 2013-1186, 2014

Case: 13-1588 Document: 56 Page: 38 Filed: 04/28/2014

WL 259824 (Fed. Cir. 2014) (non-precedential), this Court cited a number of its decisions to the effect "that section 101 did not embrace a process defined simply as using a computer to perform a series of mental steps that people, aware of each step, can and regularly do perform in their heads." In the present case, people do not regularly perform recognition of characters and fields of characters out of a stream of bits representing pixel shadings of a hard copy document – and do not do so while being "aware of each step." There is no person capable of doing so, and the factual record is silent on this and just about every other point – because there is no factual record here, as there was in *SmartGene*.

**c. Copyright-Like Algorithm Recitation Is Not Required**

Diebold contends that the failure to recite computer code is fatal under the MOT test: "CET cannot point to anything in its claims that describes any special programming code or any specific algorithm to perform the functions recited in the claims." Diebold Br. 38; see also Banks' Br. 29.

An entire section of CET's opening brief is devoted to debunking the fallacy that reciting programming code in a claim is a prerequisite for patent eligibility. CET Br. 42-44. No decision of this Court, its predecessor, or the Supreme Court requires recitation of specific programming code. Patent protection is much broader than copyright protection. It extends to applications of ideas, which can be implemented with different programming. The applications are defined by the

Case: 13-1588 Document: 56 Page: 39 Filed: 04/28/2014

language of the claims, as understood by a POSITA. Here, a POSITA would have understood the type of sub-steps for recognizing characters, recognizing fields, and targeted data operations that are required by the claims. A POSITA would have understood the sub-steps based not only on the literal language of the claims, but also on the knowledge of the art, the entire patent specification, and the prosecution history, even without the recitation of programming code in the claims. No more is required.

**d. CET's Claims Satisfy Transformation Prong Of MOT Test**

Diebold and the Appellee Banks contend that CET has waived the "transformation" prong of the MOT test. Diebold Br. 40; Banks' Br. 25. It is true that CET did not discuss separately the two MOT test "prongs." Formalistic labeling is unnecessary to argument substance. The precise place of the demarcation line between (1) a machine that transforms, and (2) the transformation itself, is unclear. CET discussed the MOT test in general. CET Br. 24-25. CET also discussed how a scanner converts an image of a hard copy document into a stream of bits corresponding to the pixel shades, and how the bit stream of the pixelized hard copy document is manipulated. *Id*. 6-7, 28, 34.

The claimed apparatus and processes are not directed to "[t]he mere manipulation or reorganization of data," as was the case in *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1375 (Fed. Cir. 2011). The apparatus and

Case: 13-1588 Document: 56 Page: 40 Filed: 04/28/2014

processes first create the data from tangible articles, the hard copy documents, and then analyze and manipulate the data in specific ways. The device that initially transforms the hard copy documents into a bit stream of pixel data is integral to the claims; the same type of data – pixel-by-pixel shading information – is not collected manually in the real world. To characterize this as "token" or "insignificant" activity ignores the indispensable nature of the scanner/scanning and this Court's decisions in *Research Corp. Tech., Inc. v. Microsoft Corp.*, 627 F.3d 859 (Fed. Cir. 2010); and *SiRF Tech, Inc. v. ITC*, 601 F.3d 1319 (Fed. Cir. 2010).

**e. Scanner/Digitizer Is Integral To The Claims Under *SiRF*, *ResearchCorp.*, And *CyberFone***

***i. SiRF***

The patent-eligible claims in *SiRF* recited an algorithm that operated on positioning data from a Global Positioning System ("GPS") receiver. *SiRF* at 1331-32. A GPS receiver calculates position, *SiRF* at 1322-23, a task amenable to the application of human mind to data read from a map, sextant, and watch. But the data on which GPS operates is qualitatively different from that provided by a watch, a sextant, or a map. It is the end result – the position – that is the same.

Diebold attempts to distinguish *SiRF* in that the "claims in *SiRF* recited numerous steps that specifically called for a GPS receiver and its operation." It is

Case: 13-1588 Document: 56 Page: 41 Filed: 04/28/2014

a mistaken statement. In *SiRF*, this Court analyzed claim 1 of U.S. Patent No. 6,937,187, reproduced below:

> 1. A method, comprising:
>
> estimating a plurality of states associated with a satellite signal receiver, the plurality of states including a time tag error state, the time tag error state relating a local time associated with said satellite signal receiver and an absolute time associated with signals from a plurality of satellites; and
>
> forming a dynamic model relating the plurality of states, the dynamic model operative to compute position of the satellite signal receiver.

*SiRF*, at 1331-32. In this claim, "a GPS receiver and its operation" is involved in exactly nothing beyond obtaining the data from the satellite signal receiver.

***ii. __Research Corp.__***

As argued in CET's opening brief (CET's Br. 33-34), the limitations of the claims here parallel those at issue in *Research Corp.*, 627 F.3d 859. *Research Corp.*'s claims were patent-eligible because "[t]he invention presents functional and palpable applications in the field of computer technology." *Id*. at 868. Diebold attempts to distinguish *Research Corp.* by saying that CET's patents do not represent "improvements to technologies in the marketplace." Diebold Br.44-45. Diebold does not explain this conclusion. The claims of the Patents-in-Suit are directed to technological improvements in the area of computer processing of hard copy documents. The widespread use of the technologies proves that they

Case: 13-1588 Document: 56 Page: 42 Filed: 04/28/2014

represent functional improvements in the marketplace – or rather would prove it if the factual development were not short-circuited.

Diebold also contends that the method in *Research Corp.* could not be "performed entirely in a human's mind," but here it can. We have answered the "mental steps" issue above. The methods of the Patents-in-Suit cannot be performed in a human mind, because the human mind is not adept at analyzing streams of bits representing shadings of individual pixels.

### ***iii. <u>CyberFone</u>***

Diebold and the Appellee Banks rely heavily on *CyberFone Sys., LLC v. CNN Interactive Grp., Inc.*, Nos. 2012-1673, 2014 WL 718153 (Fed. Cir. Feb. 26, 2014) (non-precedential). Diebold Br. 35, 41-42; Banks' Br. 6-7, 10 n.4, 29 n.12. The claims in *CyberFone* recited a telephone, and the patentee argued that the telephone was integral to the claimed method. This Court found, however, that "the telephone does not obtain data when it is functioning as a telephone, only when in an <u>unclaimed</u> mode of operation." *Cyberfone* 2014 WL 718153 *3 (emphasis provided). The telephone was not integral to the *CyberFone* claim, because it was effectively not in the claim.

The scanner/digitizer of the claims of the Patents-in-Suit is operated to convert the ink embedded in paper documents into a bit stream representing

Case: 13-1588 Document: 56 Page: 43 Filed: 04/28/2014

individual pixels of the document. The subsequent steps of the method claims operate on these data. The scanner/digitizer is indispensable to CET's claims.

**f. Scanner Integrality Defeats Comparison To *Glory***

The Appellee Banks attempt to analogize the claims of the Patents-in-Suit to those at issue in *Glory Licensing LLC v. Toys "R" Us, Inc.*, No. 09-4252, 2011 WL 1870591 (D.N.J. May 16, 2011). The addition of the scanner adds nothing to the patent-eligibility analysis, they say. Banks' Br. 41-43. See also Diebold Br. 6, 24, 40, 45.

As discussed above, the scanner/digitizer is integral to the claims of the Patents-in-Suit. This was not the case in *Glory*, as the Appellee Banks have acknowledged, Banks' Br. 41-43. There are many other differences, to which neither the Appellee Banks nor Diebold pays heed. Each patent claim is a separate invention and stands or falls independent of any other claims. *E.g.*, *Jones v. Hardy*, 727 F.2d 1524, 1528 (Fed. Cir. 1984).

Case: 13-1588 Document: 56 Page: 44 Filed: 04/28/2014

## B. CET'S OPPOSITION ON CROSS-APPEAL

### I. STATEMENT OF THE CASE

The operative pleading on the Cross-Appeal is Diebold's First Amended Complaint ("FAC"). (A296-A331) Diebold filed the FAC in response to CET's motion to dismiss five tort claims in Diebold's original Complaint. (A65 #19) The FAC dropped tort claims for unfair competition, trade libel, abuse of process, and New Jersey RICO violations, but continued to assert claims for tortious interference with contractual relations and Federal RICO violations. (A315, A324) Diebold asserted these claims against CET and against individuals: Catherine Elias, a member of CET and an inventor of CET's patents; Mitchell Medina, another inventor; and CET's attorney Jean-Marc Zimmerman. (A296)

Diebold's tort claims are based on CET's suits against five banks, alleging patent infringement based on processing information captured from scanned hard copy documents during automatic teller machine (ATM) deposits, and deposits made through mobile devices ("mobile deposits"). (A288-A294, A305 ¶24, A306 ¶29, A82-A88, A308-09 ¶38) CET asserted four patents. (A304-309 ¶¶20, 25, 30, 35, 39) Diebold was not a party to any of these suits, and did not seek to intervene.

In the FAC, Diebold alleged that it sold to each of the banks ATMs and the software for operating the ATMs, and that it is an exclusive ATM supplier to one of the banks. (A297-309 ¶¶1, 21, 26, 31, 36, and 40) Diebold also alleged that

Case: 13-1588 Document: 56 Page: 45 Filed: 04/28/2014

CET "failed to identify any model(s) of the accused ATMs, or even the supplier(s) of the ATMs, notwithstanding that such confirmation is plainly visible on the customer interface of the defendant's ATMs" and "failed to identify the 'application programs.'" (A297-A309 ¶¶22, 27, 32, 37, 41). Diebold additionally alleged that "[b]ased at least on the fact that ATMs sold by Diebold clearly, openly, and publicly identify Diebold as the supplier of such ATMs, Defendants had knowledge, when they sued Diebold's customers, that contractual relationships and/or business relationships existed between Diebold and its ATM customers providing Diebold with advantageous business relations." (A297 ¶75) The FAC contains an allegation that CET knew that one bank (SDCCU) had "suppliers." (A323, ¶94) Diebold did not allege that the identity of the supplier of the software (as opposed to hardware) used in processing ATM deposits was apparent from the ATMs, or was otherwise known to CET. Nor did Diebold allege that it provided the software or any other instrumentality used by the banks to process mobile deposits.

Diebold further alleged that all five banks sought indemnification from Diebold and that Diebold indemnified two of the banks that settled with CET (BoA and SDCCU) for the fees that the settling banks paid to CET. (A305-A309, ¶¶23, 28, 33, 42)

The FAC contains no allegations that Diebold had informed CET of its interest in the actions against the five banks before suing CET, that Diebold sought to intervene in CET's suits against the banks, or that Diebold offered to defend the banks against CET's patent infringement claims.

Diebold's FAC also alleged that CET's suits against the banks were baseless because the asserted patents were invalid, unenforceable, and not infringed. (A297, ¶1) The FAC lists several grounds of alleged invalidity of patents: sections 35 U.S.C. §§101, 102, 103, and 112. (A313, ¶¶58-60) The FAC contains no specific allegations of the reasons for invalidity under sections 102, 103, or 112.

Central allegations of the FAC relate to events that lead to this Court's opinion in *Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314 (Fed. Cir. 2011), where the predecessor of CET and its attorney asserted related patents against *Flagstar*. The claims of infringement were based on "processing of information entered on a website." *Eon-Net*, at 1319. The district court in *Eon-Net* concluded that the claims were limited to information originating from a hard copy document, and did not include web-based documents. *Id*. at 1319-20. This Court affirmed. *Id*. at 1323. This Court also affirmed Rule 11 sanction imposed by the district court.

The FAC alleges a single purpose of CET in suing the banks – obtaining payments. (A297, A304)

Case: 13-1588 Document: 56 Page: 47 Filed: 04/28/2014

CET filed a motion to dismiss the tort claims. (A399-A431) In dismissing these claims as being barred under the *Noerr-Pennington* doctrine (A27-A28), the District Court agreed that Diebold failed to allege that the sham litigation exception to the *Noerr-Pennington* immunity should apply, because the FAC does not suggest that CET intended to achieve any purpose other than obtaining payments from the banks. (A686, A688) The District Court held that further amendment by Diebold would not cure this defect. (A686)

## II. STATEMENT OF THE ISSUES

Diebold's Cross-Appeal presents the following issues:

1. Did the District Court properly dismiss Diebold's claims based on a finding that the FAC failed to allege that CET's suits against banks intended to achieve any purpose other than obtaining payments, and therefore sham exception to *Noerr-Pennington* does not apply?

2. Did Diebold state a cause of Action for civil RICO violations based on litigation conduct?

3. Are Diebold's tortious interference claims based on litigation barred by state law litigation privileges?

## III. SUMMARY OF THE ARGUMENTS

1. Diebold's FAC alleges a single motivation for CET's suits against the banks: to obtain payments. This is not intent to inflict injury collateral to the legal relief sought. Without allegations of intent to inflict a collateral injury, the sham

Case: 13-1588 Document: 56 Page: 48 Filed: 04/28/2014

exception to the *Noerr-Pennington* immunity fails, and CET's suits are immune regardless of other allegations.

2. Every Circuit Court of Appeals which considered whether litigation conduct can amount to criminal extortion or serve as a predicate act under civil Racketeer Influenced and Corrupt Organizations Act ("RICO") has rejected this proposition. Diebold cannot state a RICO claim based on CET's filing of patent infringement complaints.

3. California and New Jersey state law litigation privileges immunize litigation-related conduct from all state law claims other than procedural torts. Diebold's tortious interference claims based on CET's filing of complaints are immune under the state law litigation privileges, unless they are considered under the malicious prosecution theory. In the District Court, Diebold expressly disclaimed the malicious prosecution theory. If the tortious interference claims were considered under the malicious prosecution theory, the claims would fail because (i) Diebold was not a party to CET's suits against the banks, and (2) none of the suits was terminated in favor of Diebold or the banks.

## IV. ARGUMENT

### 1. CET's Suits Are Privileged Under *Noerr-Pennington*

The First Amendment right to petition the government for redress through litigation is generally immune from liability. *United Mine Workers v. Pennington*,

Case: 13-1588 Document: 56 Page: 49 Filed: 04/28/2014

381 U.S. 657 (1965); *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961); *Rodime PLC v. Seagate Technology, Inc.*, 174 F.3d 1294, 1307 (Fed. Cir. 1999). Even wrongful petitioning is immunized. *E.g.*, *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc. (PRE)*, 508 U.S. 49, 56-57 (1993). The doctrine is not limited to any particular context. *BE & K Const. Co. v. N.L.R.B.*, 536 U.S. 516, 525 (2002). It applies to business torts under federal law, *e.g.*, *Sosa v. DirecTV, Inc.*, 437 F.3d 923, 930 (9th Cir. 2006), and under state law, *e.g.*, *Globetrotter Software, Inc. v. Elan Computer Group, Inc.*, 362 F.3d 1367, 1377 (Fed. Cir. 2004).

Thus, a state law claim cannot be "invoked as a remedy for inequitable or other unsavory conduct of parties to proceedings in the Patent and Trademark Office" without a showing that the entire action was a sham. *Abbott Lab. v. Brennan*, 952 F.2d 1346, 1355-56 (Fed. Cir. 1991). As this Court reasoned in *Abbott Lab.*, the patent grant is within the exclusive purview of federal law, and the issue of abuse of process "relates directly to administrative proceedings before the PTO Board of Patent Appeals and Interferences." *Id*.

Relying on *Abbott Lab.*, this Court held that a state law RICO claim predicated on inequitable conduct in the PTO cannot stand, because "the wrong alleged and for which state law tort damages [are] sought [is] no more than bad faith misconduct before the PTO." *Semiconductor Energy Laboratory Co., Ltd. v.*

Case: 13-1588 Document: 56 Page: 50 Filed: 04/28/2014

*Samsung Electronics Co., Ltd.*, 204 F.3d 1368, 1382 (Fed. Cir. 2000) (quoting *Dow Chem. Co. v. Exxon Corp.*, 139 F.3d 1470, 1477 (Fed. Cir. 1998)) (alterations in original). The reasoning in *Semiconductor Energy* is explicit and directly addresses federal and state RICO claims:

> If the conduct constituting inequitable conduct, without more, could be considered predicate acts under federal or state RICO law, then every accused infringer asserting an inequitable conduct defense would also bring such a RICO counterclaim. An additional state cause of action predicated so squarely on the acts of inequitable conduct would be "contrary to Congress' preemptive regulation in the area of patent law."

*Semiconductor Energy*, 204 F.3d at 1382 (quoting *Abbott Lab.*) (emphasis provided). There is no meaningful basis to distinguish between proceedings in the PTO and patent infringement litigation. Both are the exclusive domains of federal law and federal tribunals.

CET's patent suits against the five banks are squarely within the *Noerr-Pennington* immunity doctrine. Diebold argues, however, that the so-called "sham" exception defeats CET's First Amendment petitioning rights. Diebold Br. 12.

**a. Sham Exception To *Noerr-Pennington* Does Not Apply Because Diebold Failed To Allege Intent To Inflict Collateral Injury**

Sham petitioning is a narrow exception to *Noerr-Pennington* immunity. *PRE*, 508 U.S. 49, 56 (1993). To fall within this narrow exception, the petitioning

Case: 13-1588 Document: 56 Page: 51 Filed: 04/28/2014

activity must be both (1) objectively baseless, and (2) subjectively motivated by a desire to impose a collateral injury. If a suit turns out to have some objective merit, there is no inquiry into subjective purposes and the suit is not a sham. *Id.* & n.5; s*ee Nobelpharma AB v. Implant Innovations, Inc*., 141 F.3d 1059, 1068 (Fed. Cir. 1998). Both the objective baselessness prong and the subjective intent to cause a collateral injury prong must be satisfied for the sham exception to apply. *Nobelpharma*, 141 F.3d at 1071. In fact, the subjective prong of the sham litigation test was well established before the Supreme Court ruled that objective baselessness is another prerequisite for the sham exception. *PRE*, 508 U.S. at 57. As the District Court found in the present case, the exception does not apply because Diebold did not allege that CET sought to inflict a collateral injury. (A686-A689)

Diebold has made perfectly clear what it regards as the motivation behind CET's patent infringement lawsuits: to recover patent infringement damages or settlements. The FAC overflows with allegations that CET is trying to "extort" or has already "extorted" or "extracted" the settlements. (A296-A331, ¶¶ 1, 7, 9, 18, 94, 98, 103, 105, 106, 107)

CET takes issue with Diebold's characterization of routine patent infringement actions as "extortion." But CET does not dispute that obtaining monetary relief (judgments or settlement payments) was the purpose of CET's

suits against the banks. There is nothing unusual about this, because obtaining money damages is the most common goal of civil litigation.

Money damages or settlements are not "collateral" relief or injury. And the FAC has not a single allegation of any other reason for CET's suits against the banks. Diebold does not allege that CET sued to obstruct the business of a competitor, for example, or to cause the banks to stop using Diebold's products in favor of CET's own line of competitive products. Diebold also does not allege that CET's patent infringement actions were strategic lawsuits against public participation brought to stifle anyone's free speech or interfere with the right to petition under the First Amendment. The FAC lacks a single suggestion of CET's motivation to suppress anyone's speech. Diebold does not allege that CET was motivated by these or similar objectives – or any objective other than obtaining money damages or settlement payments.

Given Diebold's unequivocal allegations regarding CET's motivation, the District Court correctly concluded that "even taking the facts in the [FAC] as true and providing plaintiff [Diebold] with requisite inferences, no allegation of a subjective desire to cause injury to plaintiff has been stated." (A689) The District Court further said, correctly, that "there is nothing in the FAC that supports a conclusion that defendants filed their suits *with the goal of causing plaintiff harm*, as opposed to merely seeking financial settlements from banks and other alleged

Case: 13-1588 Document: 56 Page: 53 Filed: 04/28/2014

infringers." (A689) The District Court made a point of noting that "Plaintiff's allegations that 'defendants extracted payments from a Diebold customer knowing the bank could recover the same from suppliers such as Diebold,' . . . does not alter the Court's conclusion." (A689).

CET filed its suits against the banks with the intent to recover monetary patent infringement damages or settlements. Diebold failed to allege that CET was motivated by a desire to cause injury collateral to the legal relief sought in its lawsuits. Diebold's FAC is dispositive on this issue: it is completely bereft of such allegations, and it makes clear that the purpose of CET's legal action was to obtain money. (A296 *passim*).

Diebold attempts to overcome the *Noerr-Pennington* immunity with a number of creative arguments. First, Diebold states that the FAC adequately alleges that Diebold was a "target" of CET's legal actions, along with the banks, in the sense that CET knew that its actions would harm Diebold. *E.g.*, Diebold Br. 13, 48, 51-54. Second, Diebold states that it does not really matter whom CET targeted, whether Diebold or the banks. Diebold Br. 51-52, 56. Third, Diebold urges that the District Court misconstrued the so-called "series of legal proceedings" line of cases. Diebold Br. 13, 56-61. Fourth, Diebold attempts to draw a distinction between (1) a litigant's intent to pursue a legal action to the final

Case: 13-1588 Document: 56 Page: 54 Filed: 04/28/2014

judgment, and (2) the litigant's intent to settle. Diebold Br. 54-55. None of these have merit.

***i. Diebold Failed To Allege That CET Intended "Harm"***

Diebold contends that CET knew it would be "harmed" by the suits against the banks. The FAC does not allege that CET intended to achieve anything other than obtain payments, which is a common and justifiable legal remedy despite the obvious fact that someone is "harmed" by making the payments. Such "harm" is inseparable from the legal remedy and is not "collateral injury," but is inherent in the legal remedy. Diebold has not alleged that CET's purpose in suing the banks was to cause harm in any way other than obtaining payments. The "intent to inflict collateral injury" prong would remain unsatisfied even if Diebold's allegation supported the inference that CET knew that Diebold supplied the accused software.

***ii. CET Did Not Target Diebold***

Diebold's trademark on some of the banks' ATMs did not provide notice that Diebold also supplied the software for processing ATM deposits. The infringing instrumentality was embodied mostly in software. Diebold itself argues that that the Patents-in-Suit are directed essentially to software. Diebold Br. 32-41. The mechanical ATMs need not be internally configured to perform all of the

Case: 13-1588 Document: 56 Page: 55 Filed: 04/28/2014

functions of the asserted claims.[16] CET had no means to determine the supplier of the software, not until filing the suits and obtaining discovery.

The only other allegations relevant to CET's knowledge of Diebold's software relate to a motion that CET and SDCCU jointly filed so that SDCCU could "contact suppliers of the accused products/services." (A323 ¶94) Diebold's argument in this Court transitions from CET's alleged knowledge that SDCCU had "suppliers" to the purported allegation that CET knew Diebold was such a "supplier." Diebold Br. 53. It is a sleight of hand. The quoted language in the FAC does not say CET knew "Diebold" was a supplier.

Although the point regarding CET's lack of knowledge regarding Diebold's involvement was well briefed in the proceedings below, Diebold has never given a reason why CET should – or *could* – have known that Diebold supplied the software.

Moreover, although Diebold does allege that it provides all of SDCCU's ATMs (A307, ¶31), the FAC contains no analogous allegations about Wells Fargo, BoA, Chase, or PNC. CET had no duty to check each and every ATM of these banks, especially in view of the thousands of ATMs these banks operate.

---

[16] It is more logical to assume that the banks either developed the software in-house or contracted with other vendors, because the infringement is not limited to ATM deposits (it also includes mobile deposits), and because some of the banks use multiple vendors for their ATMs.

Case: 13-1588 Document: 56 Page: 56 Filed: 04/28/2014

The FAC does not support an inference that CET knew that Diebold provided the accused software. CET did not target Diebold.

### *iii. Diebold Failed To Allege Intent To Inflict Collateral Injury On Any Entity*

Diebold contends that it does not really matter whether CET intended to inflict a collateral injury on the banks or on Diebold. Diebold Br. 56. It is a straw man argument, because the FAC presents no allegations of CET's intent to inflict a collateral injury on any person or entity. The only motivation of CET that is apparent from the FAC is to obtain payments. Diebold did not allege that CET bore a grudge against it or the banks, that CET competed with Diebold or the banks, that CET tried to suppress speech of Diebold or the banks.

Diebold failed to allege that CET's suits against the banks pursued any purpose other than to obtain monetary compensation.

### *iv. "Series of Legal Proceedings" Analysis Also Requires Intent To Inflict Collateral Injury*

Diebold contends that since CET filed five allegedly baseless suits, the "Series of Legal Proceedings" line of cases provides the framework for analyzing the sham exception to *Noerr-Pennington*. Diebold cites three cases: (1) *USS-POSCO Indus. v. Contra Costa County Bldg. & Construction Trades Council*, 31 F.3d 800 (9th Cir. 1994); (2) *Primetime 24 Joint Venture v. National Broadcasting Co.*, 219 F.3d 92 (2d Cir. 2000), and (3) *Livingston Downs Racing Ass'n Inc. v.*

Case: 13-1588 Document: 56 Page: 57 Filed: 04/28/2014

*Jefferson Downs Corp*., 192 F. Supp. 2d 519 (M.D. La. 2001). These cases are inapplicable because CET did not target Diebold in any of the five suits. More important, while these cases relax the objective prong of the sham exception, they underscore the importance of the subjective intent to inflict a collateral injury.

In *USS-POSCO*, "[i]nterested unions allegedly attempted to coerce UPI into awarding the general contract to a unionized contractor." 31 F.3d at 804. "[T]he unions' purpose was not to organize BE & K's employees, but to cause such delay and expense that future project owners would only hire unionized contractors and subcontractors." *Id*. (emphasis provided). The intent to inflict a collateral injury – to cause delay and expense, to motivate others to hire only union labor – was present in *USS-POSCO*. It was the objective merit of the multiple legal proceedings that was in doubt. As the Ninth Circuit put it:

> When dealing with a series of lawsuits, the question is not whether any one of them has merit—some may turn out to, just as a matter of chance—but whether they are brought pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival.

*USS-POSCO*, 31 F.3d at 811 (emphasis provided). Where some legal actions have merit, they may be sham – but only if they are brought "for the purpose of injuring a market rival," for the purpose of inflicting an injury collateral to the legal relief sought.

Case: 13-1588 Document: 56 Page: 58 Filed: 04/28/2014

In *Primetime*, the "complaint alleged that appellees . . . intentionally abused the SHVA's signal-strength challenge provision by filing baseless challenges for the purpose of raising PrimeTime's cost structure and thereby reducing competition from it. *Primetime,* 219 F.3d at 96 (emphasis provided). The intent was to raise a competitor's cost structure and reduce competition from the competitor – to inflict a collateral injury. The real issue was the objective prong. As the Second Circuit explained, quoting from *USS-POSCO*:

> it is immaterial that some of the claims might, "as a matter of chance," have merit. The relevant issue is whether the legal challenges "are brought pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival."

*Id*. at 101 (emphasis provided). The "purpose of injuring a market rival" – the purpose to inflict a collateral injury – is an unmistakable requirement of both *USS-POSCO* and *Primetime*.

The *Livingston Downs* case relied on *USS-POSCO* and *Primetime*, explaining the "series of legal proceedings" approach in these words:

> Under this approach, the pertinent question is not whether any one of the lawsuits has merit, but whether they were brought pursuant to a policy of instituting legal proceedings without regard to the merits and for the purpose of injuring a market rival. Or, as the Ninth Circuit phrased it, the court must ask, "[w]ere the legal filings made, not out of a genuine interest in redressing grievances, but as part of a pattern or practice of successive filings undertaken essentially for purposes of harassment." Because the focus of the inquiry is the defendant's intent in filing the lawsuits, it is irrelevant in this context that some of the suits prove not to be frivolous.

Case: 13-1588 Document: 56 Page: 59 Filed: 04/28/2014

*Livingston Downs*, 192 F.Supp.2d at 538 (internal citations omitted, emphasis provided). As the underlined language illustrates, the intent to inflict collateral injury is a requirement for avoiding the *Noerr-Pennington* immunity.

If this Court were to employ the "Series of Legal Proceedings" analysis of the *USS-POSCO* line of cases, the analysis would inescapably lead to the conclusion that CET's suits were not sham.

Additionally, Diebold never cited *USS-POSCO*, *Primetime*, or *Livingston Downs* in the proceedings below. It did argue the distinction between a single legal action and multiple legal actions has significance in the context of stating a RICO claim based on litigation, but never in the context of the *Noerr-Pennington* doctrine. The first time the three cases appeared below is when the District Court cited them in the opinion and order dismissing Diebold's tort claims. (A687) The District Court raised the issue and immediately disposed of it: "the concerns raised in [*USS-POSCO*, *Primetime*, and *Livingston Downs*] do not apply in this case." (A687) Diebold did not argue this theory in the District Court, and therefore waived it.

***v. <u>Settlement Does Not Defeat Noerr-Pennington Immunity</u>***

Diebold accuses CET of litigation conduct "solely designed to engender settlement." Diebold Br. 54-55. If accepted as true, this "fact" cannot defeat *Noerr-Pennington* immunity. Diebold cites no decision to support this proposition.

Case: 13-1588 Document: 56 Page: 60 Filed: 04/28/2014

"The law strongly favors the settlement of all litigation, including patent disputes." *Sanofi-Aventis v. Apotex Inc.*, 659 F.3d 1171, 1180 (Fed. Cir. 2011) (citing *Hemstreet v. Spiegel, Inc.*, 851 F.2d 348, 350 (Fed. Cir. 1988)). While litigation may be abused and nuisance settlement may be indicia of abuse, the time to punish the abuser is in the same litigation, and the person with the right to punish is the person against whom the abuser litigates. Federal courts have ample sanction powers to deal with litigation abuse. Diebold knew of the impending settlements between CET and the banks, (A306-A307, ¶¶ 28, 33), and still chose not to intervene and not to defend the banks. It sat on its hands too long. It should not be allowed now to pierce CET's immunity based on the settlements which it did not oppose.

The absolute majority of legal actions are concluded by settlement without a trial. Those that are vigorously litigated are also typically settled in the end, either before or after trial. Diebold's suggested approach, voiding immunity because an action is settled rather than pursued to final judgment, would provide litigants with the perverse incentive to litigate rather than settle. Voiding the immunity of a party for settling rather than pursuing the case to final judgment, and doing so by a third party in a subsequent litigation, would be a striking departure from the accepted *Noerr-Pennington* jurisprudence. There is no precedent and no policy reason for holding litigation to be "sham" and defeating the *Noerr-Pennington*

Case: 13-1588 Document: 56 Page: 61 Filed: 04/28/2014

immunity based on a desire or willingness to settle. Nothing indicates that the settlements between CET and the banks were unreasonable or that CET did not intend to pursue litigation.

**2. Any Error In Dismissal Of Diebold's Tort Claims Is Harmless**

If Diebold were able to amend its pleading to allege facts supporting CET's intent to inflict a collateral injury, the supposed error in dismissing Diebold's tort claims under *Noerr-Pennington* would be harmless, because the tort claims are barred on other grounds. "In general terms, the test of whether a substantial right of a party has been affected is whether the error in question affected the outcome of the case." *ATD Corp. v. Lydall, Inc.*, 159 F.3d 534, 549 (Fed. Cir. 1998). Diebold's RICO claim is barred by the absence of proximate causation, and by the well-settled principle that litigation is not criminal extortion and cannot serve as a RICO predicate act. Diebold's tortious interference claims are barred by state law litigation privileges.

**a. RICO Claim Fails For Lack Of Proximate Causation**

The Supreme Court has rejected the notion that "by reason of" language of the RICO civil remedy statute[17] can be satisfied by mere "but for" cause. *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 266 (1992). "By reason of" language "carries a proximate-cause requirement within it." *Holmes, at* 266 n.1.

---

[17] 18 U.S.C. §1964(c).

Case: 13-1588 Document: 56 Page: 62 Filed: 04/28/2014

Every civil RICO plaintiff must allege a "direct relation between the injury asserted and the injurious conduct alleged." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 457 (2006) (*quoting* from *Holmes*, at 268).

There are three reasons for emphasizing "directness" as a central requirement of RICO causation. *Holmes*, at 269. "First, the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation." *Id*. Second, "recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries." *Id*. Third, "the need to grapple with these problems is simply unjustified by the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law." *Id*. Diebold's RICO claims illustrate all three of the *Holmes* reasons.

Diebold complains of an injury that is clearly indirect. If CET's filing of patent infringement complaints were wrongful, then the wrong were visited directly upon the banks, not on Diebold. Diebold's obligation to indemnify arose indirectly, through Diebold's contractual relationship with the banks.

CET's patent infringement complaints alleged that the banks infringed not only through the use of ATMs, but also through their mobile deposit services. If Diebold's case had any merit, the District Court would have to apportion some part

Case: 13-1588 Document: 56 Page: 63 Filed: 04/28/2014

of the settlements to mobile deposits. Additionally, Diebold has not alleged that it is the sole supplier of ATMs and associated software to each of the banks. The Court might further have to apportion the ATM damages among different ATM suppliers and CET would be exposed to the risk of "multiple recoveries." CET would be further exposed to the risk of "multiple recoveries" if the banks could bring their own legal actions.

These are precisely the reasons for the Supreme Court's decision in *Holmes*. "The element of proximate causation recognized in *Holmes* is meant to prevent these types of intricate, uncertain inquiries from overrunning RICO litigation." *Anza*, 547 U.S. at 460.

The direct causes of Diebold's alleged injury are the contractual relationships between Diebold and the settling banks, the banks' decisions to settle, and Diebold's own inaction. If the banks had settled CET's claims that were meritless, as Diebold alleges, then the banks or their counsel settled unreasonably and their decisions to settle are a cause that is more proximate to Diebold's alleged injury than CET's actions. In such case, Diebold would likely not have to indemnify the banks for unreasonable settlements; otherwise, the direct cause of Diebold's damages is its contractual relationship that obligates it to indemnify the banks regardless of the merits of the claims.

Case: 13-1588 Document: 56 Page: 64 Filed: 04/28/2014

Diebold acknowledged that it was aware of CET's patent infringement actions against the settling banks well ahead of the settlements, because SDCCU and BoA demanded that Diebold indemnify them. (A306-A307, ¶¶ 28, 33). Diebold could have offered the banks a defense, Diebold could have intervened as of right,[18] and yet Diebold chose to do neither. If CET's patent infringement suits were "baseless," they could have been disposed of promptly. District courts routinely dismiss baseless litigation in early stages. There was no reason for Diebold's inaction. Either the suits had merit, or Diebold sat on its hands for too long and itself became the most direct cause of its alleged injury.

If CET's patent infringement suits were meritless, the "immediate victims" of CET's violations are the banks, which "can be expected to vindicate the laws by pursuing their own claims." *Anza*, 547 U.S. at 460. CET's patent infringement suits were not the direct cause of Diebold's alleged injury.

**b. <u>RICO Claim Fails Because Diebold Has Not Alleged Cognizable RICO Predicate Acts</u>**

Diebold's RICO claim is based on the predicate acts of purported litigation "extortion." The allegations of criminal extortion are frivolous: every Circuit Court of Appeals that has considered the proposition that litigation misconduct may rise to the level of criminal extortion has rejected it.

---

[18] Fed. R. Civ. P. 24(a).

Case: 13-1588 Document: 56 Page: 65 Filed: 04/28/2014

Litigation is the antithesis of criminal extortion. *Deck v. Engineered Laminates*, 349 F.3d 1253, 1258 (10th Cir. 2003). In *Deck*, the plaintiff alleged that the defendants filed an action "without a sound basis in fact or law," "gave or suborned perjured testimony," "prolonged the litigation," and settled the case with the intention of not paying the settlement. *Deck*, at 1256. The plaintiff brought suit alleging RICO violations, based, *inter alia*, on the predicate acts of "extortion through threats of prolonged, baseless litigation, in violation of 18 U.S.C. §§1951, 1961(1)(A)." *Id*. at 1257. Held: "extortion cannot be based on mere abusive litigation." *Id*. at 1255.

In dispensing with the claim of "extortion" based on litigation misconduct, the *Deck* Court "join[ed] a multitude of other courts in holding that meritless litigation is not extortion under §1951." *Id*. at 1258. The *Deck* Court explained:

> we encourage resort to the courts rather than resort to force and violence. Yet recognizing abusive litigation as a form of extortion would subject almost any unsuccessful lawsuit to a colorable extortion (and often a RICO) claim. Whenever an adverse verdict results from failure of the factfinder to believe some evidence presented by the plaintiff, the adverse party could contend that the plaintiff engaged in extortionate litigation. Comfortable that the adjective "wrongful" in the extortion statute was not intended to apply to litigation, we hold that Plaintiff's allegations of bad-faith litigation do not state the predicate act of extortion.

*Deck*, at 1258.

The *Deck* decision is one of many refusing to treat litigation as extortion. The Tenth Circuit addressed the same issue again in *Bixler v. Foster*, 596 F.3d 751

(10th Cir. 2010). In *Bixler*, "[p]laintiffs assert[ed] that defendants' litigation tactics were extortionate, with the purpose of coercing them to accept defendants' allegedly fraudulent acts." *Bixler* at 758. The Court held that "plaintiffs' abusive-litigation claim does not state a RICO predicate act." *Id*.

In *United States v. Pendergraft*, 297 F.3d 1198 (11th Cir. 2002) the issue of supposed extortion through a threat of litigation was presented in the context of a criminal prosecution. The Court of Appeals for the Eleventh Circuit noted that:

> Several courts have held that a threat to file a lawsuit, even if made in bad faith, is not "wrongful" within the meaning of the Hobbs Act. *See Vemco, Inc. v. Camardella*, 23 F.3d 129, 134 (6th Cir. 1994); *First Pacific Bancorp, Inc. v. Bro*, 847 F.2d 542, 547 (9th Cir. 1988); *I.S. Joseph Co. v. J. Lauritzen A/S*, 751 F.2d 265, 267-68 (8th Cir. 1984); *G-I Holdings, Inc. v. Baron & Budd*, 179 F.Supp.2d 233, 259 (S.D.N.Y. 2001); *Heights Cmty. Cong. v. Smythe, Cramer Co.*, 862 F.Supp. 204, 207 (N.D. Ohio 1994); *Am. Nursing Care of Toledo, Inc. v. Leisure*, 609 F.Supp. 419, 430 (N.D. Ohio 1984). All of these cases have arisen in the civil RICO context where litigants have included a threat to file a lawsuit as the predicate act of extortion. By rejecting such threats as predicate acts, these courts have implicitly held that threats to sue cannot constitute criminal extortion.

*Pendergraft*, at 1205 (footnote omitted).

This Court rejected an analogous position in the context of alleged abuse of PTO proceedings:

> If the conduct constituting inequitable conduct, without more, could be considered predicate acts under federal or state RICO law, then every accused infringer asserting an inequitable conduct defense would also bring such a RICO counterclaim.

*Semiconductor Energy*, 204 F.3d at 1382.

Case: 13-1588 Document: 56 Page: 67 Filed: 04/28/2014

Diebold's RICO claim cannot be supported by "extortion" under the Hobbs Act, 18 U.S.C. §1951. The same rationale applies under state laws. Additionally, state law litigation privileges immunize litigation-related conduct. *E.g.*, *Hawkins v. Harris*, 141 N.J. 207 (1995).

Because litigation is the opposite of criminal extortion, Diebold has not alleged a single predicate crime under civil RICO.

**c. Tortious Interference Claims Are Barred By State Law Litigation Privileges**

The litigation privilege in New Jersey applies to a "statement made in the course of judicial, administrative, or legislative proceedings." *Erickson v. Marsh & McLennan Co., Inc.*, 117 N.J. 539, 563 (1990). With the exception of procedural torts (abuse of process, malicious prosecution), such statements are "absolutely privileged and wholly immune from liability." *Id*.

The privilege applies to "any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action." *Hawkins v. Harris*, 141 N.J. at 216 (quoting *Silberg v. Anderson*, 50 Cal.3d 205, 212, 266 Cal.Rptr. 638, 642, 786 P.2d 365, 369 (1990)). "That immunity is predicated on the need for unfettered expression critical to advancing the underlying government interest at stake in those settings." *Hawkins*,

Case: 13-1588 Document: 56 Page: 68 Filed: 04/28/2014

at 213 (quoting *Erickson*, at 563). The litigation immunity is granted to all participants, "good and bad alike." *Id*.

The litigation privilege is not limited to statements made in a courtroom during a trial. *Hawkins*, at 216. It extends to all communications in connection with the judicial proceeding, including statements made during settlement negotiations. *Id*. (citing *Ruberton v. Gabage*, 280 N.J. Super. 125, 132-33 (App.Div.1995)).

The litigation privilege applies with equal force to claims for tortious and malicious interference with business. *Rainier's Dairies v. Raritan Valley Farms, Inc.*, 19 N.J. 552, 563-64, 117 A.2d 889, 894-95 (1955). In *Rainier's Dairies*, the defendant had previously instituted an administrative proceeding accusing the plaintiff of illegal agreements and asking for revocation of the plaintiff's license. The administrative proceeding was terminated in favor of the plaintiff. The New Jersey Supreme Court held that the statements made in the course of the administrative proceeding were clothed with same immunity as in a judicial proceeding and could not be made basis of action for malicious interference with business. *Id.* With the exception of procedural torts, the privilege is absolute. *Rainier's Dairies*, 19 N.J. at 564.

The formulation of the litigation privilege in California is substantially the same as in New Jersey:

Case: 13-1588 Document: 56 Page: 69 Filed: 04/28/2014

> The California Supreme Court set forth a useful formulation of the litigation privilege in *Silberg v. Anderson*, 50 Cal.3d 205, 266 Cal. Rptr. 638, 786 P.2d 365 (1990). Although California's litigation privilege has been codified, the underlying principles are substantially the same as those underlying the New Jersey privilege.

*Hawkins*, 141 N.J. at 215-16. The California litigation privilege applies regardless of malice. *Jacob B. v. County of Shasta*, 40 Cal.4th 948, 955, 154 P.3d 1003, 1008 (2007). It "bars all tort causes of action except malicious prosecution." *Id.*, 40 Cal.4th at 960, 154 P.3d at 1011. The privilege bars the causes of action for intentional inducement of breach of contract and intentional interference with prospective economic advantage. *Rosenthal v. Irell & Manella*, 135 Cal.App.3d 121, 185 Cal.Rptr. 92 (1982).

Diebold's tortious interference claims are barred by the New Jersey and California litigation privileges, unless they are in effect claims for malicious prosecution. In the District Court, Diebold denied that it was proceeding under the malicious prosecution theory.[19] Diebold should not be allowed to embrace this claim on appeal. Nevertheless, we address malicious prosecution.

"The one tort excepted from the reach of the litigation privilege is malicious prosecution, or malicious use of process." *Baglini v. Lauletta*, 768 A.2d 825, 834-35, 338 N.J. Super. 282, 297 (App. Div. 2001) (citing *Rainier's Dairies*, 19 N.J. at 564-66, (1955)). A claim based on an earlier litigation will be analyzed as a claim

[19] As Diebold explained, "malicious prosecution . . . appears nowhere in Diebold's FAC." (A545)

Case: 13-1588 Document: 56 Page: 70 Filed: 04/28/2014

for malicious prosecution regardless of the name attached to the claim by a litigant. In *Mayflower Industries v. Thor Corp.*, 15 N.J. Super. 139, 149-51, 83 A.2d 246 (Ch. Div. 1951), *aff'd*, 9 N.J. 605, 89 A.2d 242 (1952), Thor Corp. argued that its counterclaim against Mayflower was "for unlawful interference with economic or business relations and for abuse of process." The court disagreed, finding that Thor's claim "is so centered about the good faith of the original action . . . the claim will be treated as one for malicious prosecution." *Id*. at 150. Similarly, in *Lindes v. Sutter*, 621 F. Supp. 1197 (D.N.J. 1985), the plaintiff brought an action in which the "*predominate wrong* alleged is malicious prosecution." *Id*., at 1199. Although the plaintiff's claims could be interpreted "as incorporating a number of claims, including wrongful discharge, intentional interference with contract and malicious prosecution," the court held that "[t]he other allegations are better categorized as harm stemming from the prosecution." *Id*. at 1199-1200. The court consequently dismissed the claims because, "if plaintiff were unable to establish a wrongful prosecution, he would have no claim for wrongful discharge or tortious interference with contract." *Id.* at 1200.

In California, "the only common law tort claim that treats the instigation or bringing of a lawsuit as an actionable injury is the action for malicious prosecution." *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal.3d 1118, 1130-31 (1990). The bringing of a colorable claim is not actionable. *Id*. at 1131. If the

Case: 13-1588 Document: 56 Page: 71 Filed: 04/28/2014

claim is not colorable, the "plaintiff in a malicious prosecution action must prove that the prior action was brought without probable cause and was pursued to a legal termination in plaintiff's favor." *Id*.

In New Jersey, a claim for malicious prosecution requires a party to establish that (1) the underlying legal action was brought without probable cause, (2) the plaintiff in the underlying action was actuated by malice, (3) the underlying action was terminated in the party's favor, and (4) the party suffered a special grievance. *SBK Catalogue Partnership v. Orion Pictures Corp.*, 723 F. Supp. 1053, 1068 (D.N.J. 1989) (citing *Penwag Property Co., Inc. v. Landau*, 76 N.J. 595, 597-98, 388 A.2d 1265, 1266 (1978)). California law also requires the underlying action to have been terminated in favor of the plaintiff in the present action. *E.g.*, *Paulus v. Bob Lynch Ford, Inc.*, 139 Cal. App. 4th 659, 673, 43 Cal. Rptr. 3d 148, 159 (Cal. Ct. App. 2006).

In the present case, Diebold was not a party to the patent infringement suits. It follows that none of the suits was terminated in Diebold's favor. Moreover, the FAC does not allege that any of the five suits were terminated in favor of the banks.

If Diebold's tortious interference claims are founded on conduct other than filing of the complaints against the banks, the claims are barred by the New Jersey and California litigation privileges. If the claims are based on the filing of the

Case: 13-1588 Document: 56 Page: 72 Filed: 04/28/2014

complaints against the banks, the claims should be analyzed as procedural torts and fail because Diebold was not a party to CET's suits against the banks and the suits were not terminated in favor of Diebold or the banks.

## C. CONCLUSION[20]

For the foregoing reasons and those in CET's Opening Brief, the District Court's invalidation of the Patents-in-Suit should be reversed, and the dismissal of Diebold's tort claims affirmed.

[20] CET does not oppose Diebold's request to modify the District Court's dismissal of Diebold's Declaratory Judgment claims.

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on April 28, 2014, I caused to be filed electronically the foregoing with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system. I further certify that all of the participants in this case are registered CM/ECF users.

By: <u>/s/Jean-Marc Zimmerman</u>
ZIMMERMAN & WEISER LLP
Jean-Marc Zimmerman
Anatoly S. Weiser
226 St. Paul Street
Westfield, New Jersey 07090
Tel: (908) 654-8000
Fax: (908) 654-7207
jmz@iplcounsel.com
aw@ iplcounsel.com

Attorneys for Content Extraction and
Transmission LLC

## CERTIFICATE OF COMPLIANCE

I certify that pursuant to Fed. R. App. P. 32(a)(7) and Federal Circuit Rule 28(a)(14), the foregoing Brief was prepared in MS Word 2010, is proportionally spaced, has a typeface of 14 points Times New Roman, and contains 13,691 words, excluding those sections identified in Fed. R. App. P. 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

By: /s/Jean-Marc Zimmerman
ZIMMERMAN & WEISER LLP
Jean-Marc Zimmerman
Anatoly S. Weiser
226 St. Paul Street
Westfield, New Jersey 07090
Tel: (908) 654-8000
Fax: (908) 654-7207
jmz@iplcounsel.com
aw@ iplcounsel.com

Attorneys for Content Extraction and Transmission LLC