2013-1588, -1589, 2014-1112, -1687

# United States Court of Appeals
*for the*
# Federal Circuit

CONTENT EXTRACTION AND TRANSMISSION LLC,
*Plaintiff-Appellant,*

– v. –

WELLS FARGO BANK, NATIONAL ASSOCIATION,
*Defendant-Appellee,*

– and –

THE PNC FINANCIAL SERVICES GROUP, INC. and PNC BANK, N.A.,
*Defendants-Appellees.*

---

DIEBOLD, INCORPORATED,
*Plaintiff-Cross-Appellant,*

– v. –

CONTENT EXTRACTION AND TRANSMISSION LLC,
*Defendant-Appellant,*

– and –

MITCHELL MEDINA, CATHERINE ELIAS, JOHN DOE COMPANIES 1-100, JOHN DOE COMPANIES 1-99, TD BANK GROUP, TD BANK, N.A. and JEAN-MARC ZIMMERMAN,
*Defendants.*

Appeals From The United States District Court For
The District Of New Jersey In Nos. 12-CV-2501, 12-CV-6960
And 12-CV-7640, Judge Michael A. Shipp

## REPLY BRIEF FOR PLAINTIFF-CROSS-APPELLANT DIEBOLD, INCORPORATED

ROY H. WEPNER
ARNOLD I. RADY
LERNER, DAVID, LITTENBERG,
KRUMHOLZ & MENTLIK, LLP
600 South Avenue West
Westfield, New Jersey 07090
908.654.5000

*Attorneys for Plaintiff-Cross-Appellant Diebold, Incorporated*

May 13, 2014

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........ ii

I. THE DISTRICT COURT ERRED IN DISMISSING DIEBOLD'S TORTIOUS INTERFERENCE AND RICO CLAIMS ........ 1

A. CET Bases All Its Arguments On An Incorrect Standard For *Noerr-Pennington* Immunity ........ 1

B. Diebold's Pleading Was Replete With Allegations Of CET's Subjective Bad Faith ........ 4

C. Diebold's Pleading Plausibly Alleged That It Was A Target Of CET's Baseless Lawsuits ........ 6

D. CET Has Not Demonstrated Why The "Series Of Legal Proceedings" Authorities Are Inapposite ........ 9

E. Incantation Of The Magic Word "Settlement" Does Not Excuse CET's Abusive Litigation ........ 11

F. CET's "Harmless Error" Argument Is Actually An Improper Assertion Of Alternate Grounds To Affirm That Have Never Been Considered By The District Court ........ 12

1. The RICO Claim ........ 13

a. Proximate Causation ........ 13

b. Cognizable RICO Predicate Acts ........ 16

2. The Tortious Interference Claim ........ 18

II. CET CONCEDES THE DISTRICT COURT'S ERROR IN DISMISSING DIEBOLD'S DECLARATORY JUDGMENT CLAIMS "WITH PREJUDICE AS MOOT" ........ 19

III. CONCLUSION ........ 19

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Adorno-Bezares v. City of New Brunswick Dep't of Planning, Cmty. & Econ. Dev.*, No. 11-151, 2012 U.S. Dist. LEXIS 140330 (D.N.J. Sept. 10, 2012)................14

*ATD Corp. v. Lydall, Inc.*, 159 F.3d 534 (Fed. Cir. 1998) ..........12

*Bixler v. Foster*, 596 F.3d 751 (10th Cir. 2010) ..........17

*Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008)..........13, 14

*Cox v. Admin. U.S. Steel & Carnegie*, 17 F.3d 1386 (11th Cir. 1994) ..........13

*Deck v. Engineered Laminates*, 349 F.3d 1253 (10th Cir. 2003) ..........16

*Ecolab, Inc. v. FMC Corp.*, 569 F.3d 1335 (Fed. Cir. 2009) ..........13

*Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314 (Fed. Cir. 2011), *cert. denied*, 132 S. Ct. 2391 (2012) ..........18

*Fla. Evergreen Foliage v. E.I. DuPont de Nemours & Co.*, 135 F. Supp. 2d 1271 (S.D. Fla. 2001)..........17

*Globetrotter Software, Inc. v. Elan Computer Grp., Inc.*, 362 F.3d 1367 (Fed. Cir. 2004) ..........6, 9

*Hall Am. Ctr. Assoc. v. Dick*, 726 F. Supp. 1083 (E.D. Mich. 1989) ..........17

*Hill v. N.J. Dep't of Corr.*, 342 N.J. Super. 273 (App. Div. 2001)..........18

*Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374 (1995)..........10

*Lemelson v. Wang Labs., Inc.*,
874 F. Supp. 430 (D. Mass. 1994) .......... 17

*Loigman v. Twp. Comm. of Middletown*,
185 N.J. 566 (2006) .......... 18

*Metro. Life Ins. Co. v. Bancorp Servs., L.L.C.*,
527 F.3d 1330 (Fed. Cir. 2008) .......... 13

*Nobelpharma AB v. Implant Innovations, Inc.*,
141 F.3d 1059 (Fed. Cir. 1998) .......... 2, 3, 4

*Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd.*,
601 F.3d 1359 (Fed. Cir. 2010) .......... 12, 13

*Octane Fitness, LLC v. Icon Health & Fitness, Inc.*,
No. 12-1184, 2014 U.S. LEXIS 3107 (U.S. Apr. 29, 2014) .......... 1

*Prof'l Real Estate Inv. v. Columbia Pictures, Inc.*,
508 U.S. 49 (1993) .......... *passim*

*Singleton v. Wulff*,
428 U.S. 106 (1976) .......... 9

*Smith v. West*,
214 F.3d 1331 (Fed. Cir. 2000) .......... 10

*United States v. Pendergraft*,
297 F.3d 1198 (11th Cir. 2002) .......... 17

*Yee v. Escondido*,
503 U.S. 519 (1992) .......... 10

**STATUTES, RULES & OTHER AUTHORITIES**

18 U.S.C. § 1964(c) .......... 14

Fed. R. Civ. P. 12(b)(6) .......... 7, 17

Fed. R. Civ. P. 59 .......... 19

Fed. R. Civ. P. 61 .......... 12

Case: 13-1588 Document: 61 Page: 5 Filed: 05/13/2014

## I. THE DISTRICT COURT ERRED IN DISMISSING DIEBOLD'S TORTIOUS INTERFERENCE AND RICO CLAIMS

### A. CET Bases All Its Arguments On An Incorrect Standard For *Noerr-Pennington* Immunity

The current legal standard for the "traditional" *Noerr-Pennington* immunity (*i.e.*, the standard for situations which do not involve a series of lawsuits) is set forth in *Professional Real Estate Investment v. Columbia Pictures, Inc.*, 508 U.S. 49 (1993) ("*PRE*"). As the district court correctly noted (A686-87), the immunity is lost if, first, the suit is objectively baseless. Secondly, the court must focus on whether the baseless lawsuit conceals an attempt to interfere directly with business relationships through the use of the governmental process, as opposed to the outcome of that process, as an anticompetitive weapon. *PRE*, 508 U.S. at 60-61. The *PRE* standard was recently reaffirmed in *Octane Fitness, LLC v. Icon Health & Fitness, Inc.*, No. 12-1184, 2014 U.S. LEXIS 3107, at *18-19 (U.S. Apr. 29, 2014).

Remarkably, CET does not take issue with the district court's conclusion that Diebold had "adequately alleged that [CET] engaged in litigation that could be deemed 'objectively baseless.'" (A687.) However, CET mischaracterizes the second prong of the *PRE* sham litigation test as *solely* a question of whether the defendant was subjectively motivated by a desire to impose "collateral injury." (CET Resp. 38-41.) CET even asserts that the district court applied a "collateral injury" test (*id.* at 39) — when manifestly it did not (A686-89).

Case: 13-1588 Document: 61 Page: 6 Filed: 05/13/2014

In fact, CET's characterization of that prong, which appears some 20 times in CET's response brief, is contrary to Supreme Court precedent. The Court in *PRE* actually defined the second prong in far broader terms.

The genesis of the "collateral injury" notion appears to be the penultimate paragraph of *PRE*, which followed the Court's conclusion that the underlying copyright suit was not objectively baseless. It was in that context that the Court explained why there was no need for the district court to inquire as to *several* factors that might pertain to the second prong of the "sham litigation" exception, *i.e.*, "whether Columbia was indifferent to the outcome on the merits of the copyright suit, whether any damages for infringement would be too low to justify Columbia's investment in the suit, or whether Columbia had decided to sue primarily for the benefit of collateral injuries inflicted through the use of legal process." *PRE*, 508 U.S. at 65. But nowhere in *PRE* — or any other decision — did the Court hold that a desire to inflict "collateral injury" was the *only* consideration regarding the subjective second prong of the sham litigation exception.

In support of its effort to have "collateral injury" displace the entire second prong, CET cites *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1068 (Fed. Cir. 1998). There, this Court explained that there are two avenues by which the bringing of a patent suit can create antitrust liability, the first involving

Case: 13-1588 Document: 61 Page: 7 Filed: 05/13/2014

*Walker Process* fraud on the PTO. The second avenue is irrespective of the patentee's conduct before the PTO, and it was in that context that this Court stated:

> [I]n order to prove that suit was within *Noerr's* "sham" exception to immunity, an antitrust plaintiff must prove that the suit was both *objectively* baseless and *subjectively* motivated by a desire to impose collateral, anti-competitive injury rather than to obtain a justifiable legal remedy.

*Nobelpharma*, 141 F.3d at 1071 (emphasis in original). However, there are several reasons why that statement in *Nobelpharma* should not and cannot be viewed as this Court narrowing the standard established by the Supreme Court in *PRE*:

- First, the quoted sentence itself made clear that this Court's reference to "collateral, anti-competitive injury" was framed as the antithesis of a desire "to obtain a justifiable legal remedy." It thus suggests that the *absence* of a desire "to obtain a justifiable legal remedy" would satisfy the second *PRE* prong.

- Second, the quoted sentence was immediately followed by a full quote of the correct standard from *PRE*.

- Third, following that full quote, this Court summarized *PRE* as holding that: "A sham suit must be both *subjectively brought in bad faith* and based on a theory of either infringement or validity that is objectively baseless." *Id.* at 1072 (emphasis added).

Case: 13-1588 Document: 61 Page: 8 Filed: 05/13/2014

- Finally, this Court ultimately concluded in *Nobelpharma* that the immunity from antitrust liability was stripped by *Walker Process* fraud, such that there was no need to consider the applicability of the traditional *PRE* two-prong test. *Nobelpharma*, 141 F.3d at 1072-73. Accordingly, to the extent this Court's reference to "collateral injury" can be read to limit the sham litigation exception from *PRE*, it is actually *dicta*.

Thus, the second prong of the *PRE* test is broad enough to encompass any number of indicia that a defendant is improperly using governmental process as an anticompetitive weapon in *subjective bad faith*. A desire to inflict "collateral injury" is just one of several factors in determining *subjective bad faith*.

### B. Diebold's Pleading Was Replete With Allegations Of CET's Subjective Bad Faith

Having rewritten *PRE* to apply only where a plaintiff alleges a desire to inflict "collateral injury," CET argues that its suits against Diebold's customers represented just another, everyday patent infringement plaintiff seeking only to "obtain payments" (CET Resp. 34-35) through patent infringement damage awards or through settlements.[1] CET declaims that Diebold's pleading "has not a single

[1] In fact, each of CET's complaints against Diebold's customers also sought an injunction (*see, e.g.*, A341 ¶ C) — a remedy that would provide a nonpracticing entity like CET no commercial benefit; it would only give CET leverage to extract *more* money.

allegation of any other reason for CET's suits against the banks" (CET Resp. 40), and that Diebold's pleading is "completely bereft" of such allegations (*id.* at 41).

As Diebold previously summarized (Diebold Br. 48-51), its pleading contains plausible allegations that:

- CET is itself a sham corporation with no apparent address, no products, no services, no fulltime employees, no meaningful assets, and no apparent credit history. (A298 ¶ 4; A299 ¶ 5.)

- CET filed its suits against Diebold customers knowing that its complaints were objectively baseless (A322 ¶ 91) and continued to do so even after fatal deficiencies were brought to CET's attention (*see* A495 n.5; A318 ¶¶ 79.a, 79.b; A82-88).

- CET sued Diebold's customers one at a time to extract quick payments so as to avoid a court ruling on the merits (A297 ¶ 1), and CET's payment demands included time limitations to pressure the banks to simply pay off CET at a relatively low cost as compared with the extraordinary costs of investigating and defending the litigations on the merits (A326 ¶ 104).

- Rather than vindicate legitimate patents rights and recover damages based on the banks' usage of the alleged inventions, CET sued Diebold's customers knowing: that — given the costly burden for each bank (to *e.g.*, provide discovery regarding its many ATMs) — the customers would make

a nuisance payment having no relationship to the banks' usage of the inventions or any other bona fide damage measure; that the banks would do so irrespective of the merits of CET's claims because the cost of investigating and defending the suits would easily exceed CET's payment demands; and that the banks had the ability to make payments, for which they could obtain some recovery from Diebold and other suppliers. (A323-24 ¶ 95.)

The district court ruled against Diebold without making any specific reference to these allegations; and CET simply pretends that the allegations were never made. Without question, Diebold alleged more than sufficient facts to meet the second "subjective bad faith" prong of the *PRE* "sham litigation" exception to *Noerr-Pennington*, particularly since these well-pleaded, plausible allegations should have been construed in a light most favorable to Diebold.

### C. Diebold's Pleading Plausibly Alleged That It Was A Target Of CET's Baseless Lawsuits

Although CET seems to acknowledge that it must have known that the banks' *ATMs* that CET accused of infringement came from Diebold, CET claims that it could not have known that Diebold supplied the *software* used with those ATMs. (CET Resp. 42-43.) But Diebold alleged in considerable detail that, for decades, Diebold offered and provided to customers *software* designed to be used with numerous Diebold ATM models. (A310-11 ¶¶ 45-48.) Diebold also alleged

Case: 13-1588 Document: 61 Page: 11 Filed: 05/13/2014

that it is a party to contracts of sale with its ATM customers pursuant to which Diebold stands behind its ATMs *and its software*. (A315 ¶ 73.) Diebold further alleged that CET should have known that it was likely that Diebold warranted that its ATMs *and its software* were delivered free of any rightful claim of patent infringement. (A316-17 ¶ 75.)

CET tells us it is more logical to assume that the banks either developed the software in-house or contracted with other vendors. (CET Resp. 43 n.16.) Of course, this rank speculation — supported by nothing in the record — has no place in an analysis under Fed. R. Civ. P. 12(b)(6), which focuses solely on Diebold's allegations and construes them in a light most favorable to Diebold. At most, CET is suggesting that evidence *might* exist which refutes Diebold's allegations, or which *might* provide Diebold with a defense to a claim for indemnification by one of its customers that was sued by CET.

But this misses the point. The prominent DIEBOLD® label on ATMs used by each of the banks CET chose to sue (and on *all* of the ATMs used by one of those banks) necessarily made it clear to CET that CET's baseless complaints — expressly accusing ATMs of being an instrumentality of patent infringement — would directly and negatively impact Diebold.

In connection with the incident involving that one bank, San Diego County Credit Union ("SDCCU"), whereby CET and SDCCU made a joint filing so that

SDCCU could "contact suppliers of the accused products/services" in anticipation of a settlement, CET accuses Diebold of "sleight of hand," because the quoted language in the joint filing did not say that CET knew that *Diebold* was a supplier. (CET Resp. 43.) But two paragraphs later, CET concedes that Diebold *has* alleged that it provides *all* of SDCCU's ATMs. (*Id.*; A307 ¶ 31.) While CET asserts it had no duty to inspect "each and every" one of the "thousands of ATMs" used by the five banks CET sued (CET Resp. 43), if CET had inspected even *one* SDCCU ATM before it filed suit — *any* SDCCU ATM — it necessarily would have known that Diebold was one of SDCCU's suppliers that were being contacted about paying off CET.[2]

These arguments by CET should not obscure a more fundamental flaw in CET's position. Diebold previously noted the absence of authority for the proposition that, for purposes of the sham litigation exception to *Noerr-Pennington*, a defendant's subjective bad faith must be directed solely at the party seeking redress. (Diebold Red Br. 51-52.) That absence of authority remains, and CET has not attempted to fill it.

---

[2] CET asserts that Diebold's pleading contains no allegations as to the other banks "analogous" to Diebold's allegation that it was the sole supplier of ATMs to SDCCU. (CET Resp. 43.) In fact, Diebold did allege that it was the "predominant" supplier of ATMs to Appellee PNC Bank. (A308 ¶ 36.)

Case: 13-1588 Document: 61 Page: 13 Filed: 05/13/2014

### D. CET Has Not Demonstrated Why The "Series Of Legal Proceedings" Authorities Are Inapposite

In its opinion, the district court held that the "series of legal proceedings" cases do not apply solely because Diebold was not alleging "antitrust injury." (A687 (citing *Globetrotter Software, Inc. v. Elan Computer Grp., Inc.*, 362 F.3d 1367, 1377 (Fed. Cir. 2004)).) Diebold has explained why the district court's rationale for not applying the "series of legal proceedings" cases was erroneous, and why *Globetrotter* was inapposite. (Diebold Red Br. 59-61.) CET has made no effort to support or justify the district court's stated rationale for disregarding the "series of legal proceedings" cases.

CET does argue, however, that Diebold has waived this issue because it did not cite those cases in briefing before the district court. (CET Resp. 47.) To begin with, it is indisputable that Diebold vigorously contested all of CET's assertions of *Noerr-Pennington* immunity at the district court. It is true that Diebold did not cite those particular cases to the district court. But it is also true that the district court discussed those cases *sua sponte* and decided on the merits that the cases were inapplicable.

The Supreme Court has stated: "It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below." *Singleton v. Wulff*, 428 U.S. 106, 120 (1976). Here, there can be no question that the district court "passed upon" the cases discussing the "series of legal

Case: 13-1588 Document: 61 Page: 14 Filed: 05/13/2014

proceedings" approach to *Noerr-Pennington*, concluding that they were irrelevant. Moreover, "once a federal claim is properly presented" — such as Diebold's claim to the sham litigation exception to *Noerr-Pennington* — "a party can make any argument in support of that claim; parties are not limited to the precise argument they made below." *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 379 (1995) (quoting *Yee v. Escondido*, 503 U.S. 519, 534 (1992)). And this Court has stated that rules regarding raising issues for the first time on appeal do not apply where the lower "court itself raised it and relied on it *sua sponte*," in which case it would be "part of the court's decision as indicated by its written opinion." *Smith v. West*, 214 F.3d 1331, 1333 (Fed. Cir. 2000).

Accordingly, under these circumstances, since the district court's views regarding those cases formed part of its decision to dismiss Diebold's tortious interference and RICO claims, Diebold has the right to address that portion of the district court's ruling before this Court. Those cases support Diebold's contention that CET and its principals filed a "series" of five suits, which were not only filed without regard to the merits; they were filed with knowledge that the complaints were objectively baseless.

This leaves CET to contend — yet again — that even under the "series of legal proceedings" cases, Diebold was required to allege that CET had an intent to

Case: 13-1588 Document: 61 Page: 15 Filed: 05/13/2014

inflict "collateral injury." As already demonstrated (*see* Part I.A), that is simply the wrong legal standard under *every* approach to the *Noerr-Pennington* doctrine.

### E. Incantation Of The Magic Word "Settlement" Does Not Excuse CET's Abusive Litigation

Arguing that the law favors settlement of litigation, CET states that "[w]hile litigation may be abused and nuisance settlement may be indicia of abuse" — CET's conduct here being a poster child for that proposition — "the time to punish the abuser is in the same litigation, and the person with the right to punish is the person against whom the abuser litigates." (CET Resp. 48.)

Thus, according to CET, a bank faced with a patent infringement suit brought by CET must first invest hundreds of thousands of dollars or more on deciphering *admittedly* insufficient complaints (*see* A603-06 ¶¶ 22, 27, 32, 37, 41), discovery, claim construction as to terms in hundreds of patent claims, and dispositive motions; and then lay out additional thousands of dollars in a motion to recover all of the foregoing fees. And, according to CET, the bank must do so under circumstances where CET has offered a cheap and quick "settlement" which will enable the bank to simply be rid of CET, a decision made even easier where the bank can seek to recover the "settlement" funds paid to CET from vendors such as Diebold.

Simply stated, the mere fact that Diebold's customers agreed to "settle" with CET does not mean that CET should get a pass for abusive litigation.

Case: 13-1588 Document: 61 Page: 16 Filed: 05/13/2014

**F. CET's "Harmless Error" Argument Is Actually An Improper Assertion Of Alternate Grounds To Affirm That Have Never Been Considered By The District Court**

CET asserts that if the district court erred in dismissing Diebold's claims under *Noerr-Pennington*, such error would be "harmless." Harmless error refers to "errors and defects that do not affect any party's substantial rights." Fed. R. Civ. P. 61. As CET notes, the test of whether a substantial right of a party has been affected is whether the error in question affected the outcome of the case. (CET Resp. 49 (quoting *ATD Corp. v. Lydall, Inc.*, 159 F.3d 534, 549 (Fed. Cir. 1998)).) There can be no serious question that if the district court was mistaken about the *Noerr-Pennington* doctrine, Diebold's substantial rights were affected, in that this was the only ground on which Diebold's tortious interference and RICO claims were dismissed.

CET argues, however, that the error is "harmless," because the tort claims are barred on other grounds. What CET neglects to mention is that during proceedings before the district court, CET argued for — and Diebold argued against — these and other alternate grounds for dismissal. But *the district court never addressed any of those grounds*, basing its decision entirely on the *Noerr-Pennington* doctrine.

This Court normally will not consider in the first instance issues that were never addressed by the district court. *See, e.g., Novo Nordisk A/S v. Caraco*

*Pharm. Labs., Ltd.*, 601 F.3d 1359, 1367 (Fed. Cir. 2010) ("Without any finding to review, this court declines to adjudicate this issue in the first instance."); *Ecolab, Inc. v. FMC Corp.*, 569 F.3d 1335, 1352 (Fed. Cir. 2009) (declining to analyze *eBay* factors regarding injunction in the first instance); *Metro. Life Ins. Co. v. Bancorp Servs., L.L.C.*, 527 F.3d 1330, 1336 (Fed. Cir. 2008) (declining to address issue of claim construction for the first time on appeal). Accordingly, should this Court overturn the district court's dismissal based on *Noerr-Pennington*, CET can seek to revisit its alternative grounds for dismissal if this case returns to the district court.

In the event, however, that this Court chooses to consider these unadjudicated alternative grounds on the merits, Diebold will here discuss them briefly.

### 1. The RICO Claim

#### a. Proximate Causation

CET asserts that Diebold failed to properly allege "proximate causation" in its RICO claim. (CET Resp. 49-52.) This is quite an about-face, since CET admitted before the district court that: "All of Diebold's alleged damages resulted from CET's infringement actions against the banks." (A407.)

Proximate cause is not the same thing as the sole or only cause. *See, e.g., Cox v. Admin. U.S. Steel & Carnegie*, 17 F.3d 1386, 1399 (11th Cir. 1994). In *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008), the Court held that

the defendant's fraudulent representations to a third party could proximately cause the plaintiffs' injury, even where the plaintiffs did not directly rely on those misrepresentations. *Id.* at 656.

CET says a great deal about purported problems of "apportionment" of damages in view of the fact that some of the banks sued by CET used other ATMs in addition to Diebold's, and were also sued in connection with "mobile" banking, which does not involve Diebold at all. But the purported issue of apportionment is a red herring; Diebold is only seeking to recover (before trebling under 18 U.S.C. § 1964(c)) the amounts Diebold paid to the banks by way of reimbursement of an agreed upon portion of the settlements attributed to Diebold's ATMs and related software which CET had extorted from the banks in question. In *Adorno-Bezares v. City of New Brunswick Department of Planning, Community & Economic Development*, No. 11-151, 2012 U.S. Dist. LEXIS 140330 (D.N.J. Sept. 10, 2012), the court held that the defendant-contractor's corrupt cash payments to city inspectors for lenient inspections were the proximate cause of a fire in the plaintiff's home caused by a faulty wiring system. *Id.* at *15 ("there is no need for the Court to adopt a complicated system to apportion damages. . . . because the defendants' actions principally affected Plaintiffs' home").

CET asserts that Diebold itself caused its own damages, because Diebold did not intervene in each of the five infringement suits CET brought against Diebold customers. (CET Resp. 52; *see also id.* at 32, 34, 48.) However, on December 7, 2012, Diebold *did* file the action from which this cross-appeal arose in which Diebold sought declaratory judgments of not only invalidity and unenforceability, but also declarations of noninfringement and laches as to both Diebold and its customers, as well as an injunction against CET suing or threatening to sue Diebold's customers. (A330-31 ¶¶ C, D, I.)

Moreover, just two weeks after filing suit, Diebold sought an order consolidating Diebold's action against CET with the only CET infringement suits still pending in the District of New Jersey; namely, the suits against Wells Fargo and PNC. (A45 (Dkt.14).)[3] By the time the consolidation order was entered in February 2013 (A377-78), these consolidated cases were the only cases pending in any court involving CET's patents.[4] CET provides neither authority nor logic for the proposition that a vendor such as Diebold, whose customers are being harassed

[3] CET's suit against Bank of America in the District of New Jersey had been settled in 2012.

[4] CET's suit against SDCCU in the Southern District of California had been settled in 2012. CET's suit against JP Morgan Chase in the District of Delaware was voluntarily dismissed by CET in January 2013 in apparent response to Diebold's filing suit against CET.

Case: 13-1588 Document: 61 Page: 20 Filed: 05/13/2014

by a patentee, can protect its customers only by intervening in each individual action, rather than file a declaratory judgment action as Diebold did here.

In arguing that Diebold's "inaction" was the cause of Diebold's damages, CET also asserts that: "If CET's patent infringement suits were 'baseless,' they could have been disposed of promptly. District courts routinely dismiss baseless litigation in early stages." (CET Resp. 52.) Of course, that is precisely what happened in the *PNC* case, and CET has expended copious pages in its briefs before this Court arguing that the district court disposed of the *PNC* action *too* "promptly" and *too* "early."

In any event, CET's suggestion that Diebold's own acts caused Diebold's damages are illogical and unsupportable. And it cannot and does not detract from the fact that Diebold more than adequately pleaded proximate causation of damages.

**b. <u>Cognizable RICO Predicate Acts</u>**

CET cites cases from various circuits which are said to stand for the proposition that litigation cannot be considered "extortion" for RICO purposes. (CET Resp. 52-55.) They stand for no such thing.

*Deck v. Engineered Laminates*, 349 F.3d 1253, 1258 (10th Cir. 2003), held that a *single* meritless state action cannot make out a claim of extortion. This is clearly distinguishable from CET's systematic campaign of filing multiple sham

Case: 13-1588 Document: 61 Page: 21 Filed: 05/13/2014

lawsuits with nearly identical legally insufficient allegations to coerce settlements by exploiting the high cost to each bank to defend complex patent litigation.

*Bixler v. Foster*, 596 F.3d 751 (10th Cir. 2010), primarily addressed whether shareholder plaintiffs have standing to bring a RICO action for injuries sustained by the corporation. *Id.* at 758. And *United States v. Pendergraft*, 297 F.3d 1198, 1208 (11th Cir. 2002), was an admittedly "narrow" holding that a *single* threat to sue the government, even if made in bad faith, cannot be considered wrongful under the Hobbs Act — again, a situation bearing no relationship to this case.

To be sure, numerous courts have held that campaigns of baseless litigation for the purpose of extracting nuisance settlements can constitute "extortion" under RICO. *See, e.g., Hall Am. Ctr. Assoc. v. Dick*, 726 F. Supp. 1083, 1097 (E.D. Mich. 1989) (by alleging an extortionate scheme of litigation to obtain property through the use of economic fear, plaintiff had properly pled a violation of the Hobbs Act and thus sufficiently stated a predicate act under the RICO statutes); *Lemelson v. Wang Labs., Inc.*, 874 F. Supp. 430, 434 (D. Mass. 1994) (in RICO case, contentions that patentee "extorted millions of dollars in settlement monies through a pattern of litigation involving infringement claims based on fraudulently obtained patents" met the requirements of Rule 12(b)(6)); *Fla. Evergreen Foliage v. E.I. DuPont de Nemours & Co.*, 135 F. Supp. 2d 1271, 1285-86 (S.D. Fla. 2001) ("the filing of vexatious lawsuits to extort money or

Case: 13-1588 Document: 61 Page: 22 Filed: 05/13/2014

property may constitute the requisite predicate racketeering acts"); *see also Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314, 1326-27 (Fed. Cir. 2011), *cert. denied*, 132 S. Ct. 2391 (2012), where this Court affirmed a characterization of this very behavior — by a company that CET now admits to be its "predecessor" (CET Resp. 34) — as exhibiting "indicia of extortion."

### 2. **The Tortious Interference Claim**

CET argues at length that Diebold's tortious interference claim is barred by state law "litigation privilege." (CET Resp. 55-60.) But CET's own authorities make clear that the litigation privilege applies only to statements made *in the course of* judicial, administrative, or legislative proceedings. (*See id.* at 55-57.) However, the improper *filing* of a lawsuit is not a protected communication under the litigation privilege. *Hill v. N.J. Dep't of Corr.*, 342 N.J. Super. 273, 295-96 (App. Div. 2001); *see also Loigman v. Twp. Comm. of Middletown*, 185 N.J. 566, 584 (2006). CET nowhere explains how CET's tortious interference claim is based on statements made in the course of CET's sham lawsuits against Diebold's customers, as contrasted with the filing of those suits in the first instance.

Accordingly, CET's suggestion that this Court dismiss Diebold's tortious interference claim on the basis of the litigation privilege — again, without any prior analysis by the district court — is baseless.

Case: 13-1588 Document: 61 Page: 23 Filed: 05/13/2014

## II. CET CONCEDES THE DISTRICT COURT'S ERROR IN DISMISSING DIEBOLD'S DECLARATORY JUDGMENT CLAIMS "WITH PREJUDICE AS MOOT"

Diebold has explained its view that the district court erred in dismissing Diebold's declaratory judgment claims "with prejudice as moot" in light of the district court's invalidation of CET's four patents-in-suit. (Diebold Red Br. 61-64.) CET has not seen fit to even respond to this portion of Diebold's cross-appeal, even though CET did oppose Diebold's motion under Fed. R. Civ. P. 59 to alter or amend the district court's original judgment order so that Diebold's declaratory judgment claims would be deemed dismissed "without prejudice as moot." (A643.)[5]

## III. CONCLUSION

For the reasons set forth in Diebold's original brief, and the additional reasons set forth herein, this Court should reverse the district court's dismissal of Diebold's tortious interference and RICO claims, and remand for further proceedings.

---

[5] The basis for CET's opposition made no sense. It urged that the relief should be "parallel" and that there is "no justification for treating differently" Diebold's declaratory judgment claims and CET's infringement claims "because they are all based on the same patents." (A643.) The obvious problem with this argument is that CET's infringement claims were properly dismissed with prejudice because there had been an adjudication of invalidity *against CET* as to CET's patents; but there had been no adjudication *against Diebold* that would warrant a dismissal of Diebold's declaratory judgment claims with prejudice.

Case: 13-1588 Document: 61 Page: 24 Filed: 05/13/2014

Since neither the district court nor CET has advanced any reason why the dismissal of Diebold's declaratory judgment claims should have been with prejudice, this Court should modify that portion of the judgment so that the dismissal is without prejudice, or should remand to the district court to do so.

Respectfully submitted,

LERNER, DAVID, LITTENBERG,
KRUMHOLZ & MENTLIK, LLP
*Attorneys for Plaintiff-Cross-Appellant*
*Diebold, Incorporated*

Dated: May 13, 2014

By: /s/ Roy H. Wepner
Roy H. Wepner

# CERTIFICATE OF SERVICE

2013-1588, -1589, 2014-1112, -1687

I, Robyn Cocho, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by LERNER, DAVID LITTENBERG, KRUMHOLZ & MENTLIK, LLP, Attorneys for Plaintiff-Cross-Appellant to print this document. I am an employee of Counsel Press.

On **May 13, 2014**, Counsel for Plaintiff-Cross-Appellant has authorized me to electronically file the foregoing **Reply Brief of Plaintiff-Cross-Appellant Diebold, Incorporated** with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Jean-Marc Zimmerman, Esq.
ZIMMERMAN & WEISER, LLP
226 St. Paul Street
Westfield, NJ 07090
Tel: 908.654.8000
*Attorneys for Plaintiff-Appellant Content Extraction & Transmission LLC*

Noam J. Kritzer, Esq.
BAKOS & KRITZER
14 7 Columbia Turnpike
Florham Park, NJ 07932
Tel: 732.751.1766
*Attorneys for The PNC Financial Services Group, Inc. and PNC Bank, NA.*

Frederick L. Whitmer, Esq.
KILPATRICK TOWNSEND & STOCKTON LLP
The Grace Building
1114 A venue of the Americas
New York, NY 07450
Tel: 212.775.8773
*Attorneys for Wells Fargo Bank, National Association*

Copies will be sent to the above counsel upon the court's approval.

Upon acceptance by the Court of the e-filed document, six paper copies will filed with the Court, via Federal Express, within the time provided in the Court's rules.

/s/ Robyn Cocho
Counsel Press

**CERTIFICATE OF COMPLIANCE**
**WITH TYPE-VOLUME LIMITATION**

Pursuant to Rule 32(a)(7)(B) and (C) of the Federal Rules of Appellate Procedure, the undersigned hereby certifies that, based upon the word count of the word-processing system used to prepare this brief, the number of words in this brief is 4492.

Dated: May 13, 2014

By: /s/ Roy H. Wepner
Roy H. Wepner